JUNO, The (SAVIN v.). See Case No. 12,390.

JUNO, The (WILLIAMS v.). See Case No. 17,724.

---

# Case No. 7,585.

## The JUPITER.

### [1 Ben. 536.][1]

District Court, S. D. New York. Nov., 1867.

COLLISION—SAILING VESSELS—JURISDICTION—VESSEL CLOSE-HAULED ON STARBOARD TACK—CHANGE OF COURSE IN EXTREMIS.

1. A Dutch schooner and a Russian bark came in collision in the North Sea, by which the schooner was sunk. Each vessel claimed that she was close-hauled, and that the other had the wind free. The bark was on the port tack, and the schooner on the starboard tack. Both vessels kept their courses, till so near that a collision was inevitable if they held on, when the schooner ported her helm, and shortly afterward the bark also ported, but too late. The direction of the wind was disputed on the evidence. The bark was going about eight knots an hour, and the schooner about two knots and a half. *Held*, that on the evidence, the schooner was close-hauled—as close as she could be.

2. It was the duty of the bark to have ported earlier than she did, and to have kept out of the schooner's way.

3. It was not a fault in the schooner that she luffed when she did, instead of starboarding her helm, for she had the right to assume that the bark would port, which she did do, when too late; but, for an act done under the circumstances in question, even if it had not been judicious, the schooner would not be responsible as for a fault, because it was done in a moment of peril, into which she had been brought by the fault of the bark.

[Cited in The Havilah, 33 Fed. 877; The Athabasca, 45 Fed. 656.]

4. The bark was in fault in not keeping a vigilant lookout.

5. This court had jurisdiction of the action.

[Cited in Bernhard v. Creene, Case No. 1,349; The Belgenland, 114 U. S. 355, 5 Sup. Ct. 866.]

In admiralty.

E. H. Owen, for libellants.

Beebe & Donohue, for claimants.

BLATCHFORD, District Judge. This is a libel for a collision, filed by the owners of the Dutch schooner Aeolus, against the Russian bark Jupiter, owned by residents of Bremen. The libel is filed by such owners in their own behalf, and as bailees of, and on behalf of the owners of, the cargo of the Aeolus. The schooner was on a voyage from Cronstadt, in Russia, to Koogerpolder, in Holland, with a cargo of linseed on

---

[2] [From 1 Am. Law Reg. 262.]

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

freight. The bark was on a voyage from Bremen to New York, with a cargo and passengers. The collision took place between one and two o'clock in the afternoon, on the 5th of September, 1864, in the North Sea, in latitude 56° 7' north, and longitude 5° 15' east from Greenwich. The schooner was so injured that she sank within a few minutes, and was totally lost. The libel avers that the schooner was close hauled on her starboard tack, and heading somewhere about southwest by south; that the wind was strong from the northward and westward, and the sea high; that the bark was on her port tack, and heading nearly opposite to the schooner; that the bark had no sufficient lookout, and did not attempt to keep away, but kept right on towards the schooner; that the schooner put her helm to port, and tried to luff into the wind, and avoid the collision, but, being in the trough of the sea, did not answer her helm quickly; and that the bark was hailed to keep away, but paid no attention to the hail, and kept on till she struck the schooner on her port bow. The answer avers that the wind was west north-west; that the bark was close hauled and steering north by west, and sailing from seven to eight knots an hour; that the schooner was seen some three miles off, from two to three points on the starboard bow of the bark; that the schooner had the wind free, and was on a course which would have carried her to the starboard of the bark had both vessels kept their courses; that the bark, being close hauled, kept her course, and had a right to do so; that the schooner also kept her course, with the wind free, until the vessels approached each other, and until the schooner reached a position on the starboard bow of the bark, and slightly ahead, but still steering in a way that, if her course had been kept, would have carried her to the starboard side of, and under the stern of, the bark, when she suddenly luffed, coming up into the wind and changing her course nearly to the west, and came upon the starboard bow of the bark, the port bow of the schooner coming in contact with the starboard bow of the bark, and the schooner swinging alongside of the starboard side of the bark, and soon after sinking; that, as soon as the schooner was seen to luff, the wheel of the bark was put to port, and efforts were made to keep her off, but the distance between the two vessels was so small that very little if any change in the course of the bark was effected; and that the schooner, before the collision, had been steering south-west by south.

It is established, by the evidence, that the bark was heading north by west, and was close hauled on her port tack, and was sailing about eight knots an hour. It is claimed for the bark, that the wind was west north-west, or not further to the west than west by north, and that the bark was sailing within from five to six points of the wind.

For the schooner, it is claimed, that the wind was west, and that the schooner was heading south-west by south, close hauled on her starboard tack, and sailing within five points of the wind. But the bark claims that the schooner was not close hauled, but was sailing with a free wind. If the bark and the schooner were both of them close hauled, it was the duty of the bark, being on her port tack, to give way, and it was the duty of the schooner, being on her starboard tack, to keep her course. But, if the schooner had the wind free, and the bark was close hauled, it was the duty of the schooner to give way, even though she was on her starboard tack, and it was the duty of the bark to keep her course, even though she was on her port tack. I have arrived at the conclusion, after a careful examination of the evidence, that the schooner was close hauled, and was sailing as close to the wind, on her starboard tack, as she could sail. The testimony of the master, and of all of her crew who have been examined, three in number, is, that she was sailing as close to the wind as she could lie. The master says, that even then she was to the leeward of the true course to her port of destination, and that he could not keep her up to her true course. Of the men on the bark, but two, the chief mate and Pepper, claim to have seen the schooner till just at the moment of collision, or to have noticed her course as she approached the bark from a distance. Holling, a passenger on the bark, saw the schooner two miles off, and says that she had the wind, as far as he could see, one or two points free. Much stress is laid by the bark upon the testimony of those on board of the bark as to the direction of the wind, and it is urged that, the wind being west north-west, and the schooner sailing south-west by south, she was not sailing within seven points of the wind, and was, therefore, sailing free, because the bark was sailing close hauled within five points of the wind. But the dispute about the course of the wind is only as to whether it was west or west north-west, a difference of only two points. If one point is taken off from the claim on one side, and one point is added to the claim on the other side, as to the direction of the wind, thus dividing the difference, then, the bark sailing west by north and the schooner south-west by south, each vessel would be sailing within six points of the wind. Without deciding as to the exact course of the wind, I think the testimony of those on the schooner, as to the fact that she was close hauled, is to be relied on, especially in view of the fact that she was making but two and a half knots an hour. According to the theory of the bark, the bark was making eight knots an hour while sailing within five points of the wind, while the schooner was sailing no closer to the wind than seven points, and making only two and a half knots an hour. According to the theory of the

schooner, the bark was sailing as far off as seven points from the wind, while the schooner was within five points of it, a state of things more probable, from the respective rates of going of the two vessels.

It was strongly argued for the bark, that the master of the schooner testified that, before the collision, the schooner luffed up into the wind as much as four points, and still had her sails full, and that, therefore, she must have had the wind free. It is true, that the master of the schooner says that the schooner had luffed about four points before the collision, and that, at the time of the collision, her sails were full. But it is not at all clear that she did luff to this extent. Gerzonius, one of her crew, who was on deck when she luffed, says, on his direct examination, that she "came up to one and a half points in the wind before the collision"; but on his cross-examination, he says, that, "by luffing, she changed her course one point and a half," and that he did not notice whether her sails were full or shaking at the time of the collision. I think that what the master really testified was, that the schooner had luffed to about four points from the wind, and that what Gerzonius testified to, on his direct examination, was, that she came up one and a half points into the wind before the collision, that is, that she changed her course by luffing a point and a half, and came up to four points from the wind, and not that she changed her course four points by luffing and came up to a point and a half from the wind. For the master says, that the schooner was sailing at the time five and a half points from the wind; Gerzonius says, four and a half to five points; Barf says, five to six points; Schipper says, six points. Schipper says, that the schooner's sails were full at the time of the collision, but Schwetzer, one of the crew of the bark, says, that the schooner's sails were shaking at the time of the collision. I think it is impossible to believe, on the whole evidence, that the schooner could have luffed up as much as four points and still have had her sails full. If she did luff up four points, her sails must have shaken. At all events, the evidence as to the extent of her luffing and as to whether, after she had luffed, her sails were or were not full, is so unsatisfactory, that it is not safe to predicate upon it any conclusion as to the course she was on when she started to luff, or as to whether she then had the wind free or not. The other testimony, before referred to, going to show that she was in fact close hauled, is much more reliable and is entirely satisfactory.

As the schooner was close hauled on her starboard tack, she was entitled and bound to keep her course, as against the bark. It is alleged by the bark, that the schooner changed her course before the collision, and thereby caused the collision by the luff she made, and that, if she had kept her course, the collision would not have occurred. But it is proved that the schooner did not luff until a collision was inevitable, if both vessels should keep their courses, and that she then luffed because she saw that the bark persisted in holding her course and would not port her helm. It was no fault on the part of the schooner to luff under those circumstances. When she luffed she was close to the bark. Pepper, a seaman on the bark, says, that the schooner was about three ships' lengths off when she changed her course. Schwetzer says, that, when the schooner was five or six lengths off, she was luffing into the wind. The master of the schooner says, that she was about a cable's length from the bark when she luffed. For an act done under those circumstances, in extremis, at the moment of peril, the schooner would not be responsible as for a fault. The peril into which she had been brought was not her own fault, but was the fault of the bark in not keeping off; and a movement to save herself, when a collision was inevitable, even though not a judicious one, cannot be imputed to her as a fault, or relieve the bark from responsibility for bringing on the peril. Bentley v. Coyne, 4 Wall. [71 U. S.] 512. But the movement of the schooner to luff, instead of starboarding her helm, was proper, for she was entitled to conclude that the bark, if she made any movement, would port her helm, as the bark in fact did, but too late. If the schooner had starboarded and the bark had ported, such joint movements would not have tended to prevent a collision.

I am satisfied that this collision happened through negligence on the part of the bark in not porting her helm in time to avoid the schooner, and that she failed to port it in time because she had no proper lookout. The persons in charge of the bark at the time observed the schooner a long distance off, and then paid no further attention to her till the bark was only three or four ships' lengths off from her. Then, after the schooner had ported her helm and was luffing, the bark ported her helm, but too late to avoid the collision.

The claimants set up that, inasmuch as the bark is a Russian vessel, and her owners reside in Bremen, and the schooner is a Dutch vessel, and she and her cargo were owned by residents of Holland, this court has no jurisdiction of the action. A general objection to the jurisdiction of the court is taken by the answer. Without going into any extended discussion of the question, I am satisfied that this court has jurisdiction. The Johann Friederich, 1 W. Rob. Adm. 36; Fland. Mar. Law, § 381.

There must be a decree condemning the bark, with a reference to a commissioner to ascertain the damages caused to the libellants by the collision.