BELLAMY, (VARNUM v.) See Case No. 16,-886.

---

## Case No. 1,269.

### The BELLE.

[1 Ben. 317;[1] 9 Leg. & Ins. Rep. 276.]

District Court, S. D. New York. Aug. Term, 1867.

COLLISION BETWEEN SAILING VESSELS OFF BARNE-GAT—CHANGE OF COURSE IN EXTREMIS—LIGHTS —BRITISH STATUTE NOT BINDING UPON A BRIT-ISH VESSEL MEETING A VESSEL OF ANOTHER NATION AT SEA.

1. Where a British schooner bound to New York, close-hauled on the wind, met an American brig bound out, with the wind free, and kept her course till a collision was imminent, when she ported her helm, but did not avoid the collision; the schooner not having the lights required by the British merchants' shipping act, and the collision having taken place before the passage of the act of congress respecting lights on vessels at sea: Held, that it was the duty of the brig to keep out of the way, and of the schooner to hold her course.

2. That the court will not stop to inquire whether some other manoeuvre on the part of the schooner than porting might have proved more successful. The error of a vessel, which has been brought into immediate jeopardy by the fault of another, committed in a moment of alarm, will not subject her to damages or prevent her recovery.

[See Haney v. The Louisiana, Case No. 6,021, as to mistakes committed in moments of peril and excitement, when produced by mismanagement of those in charge of the other vessel, and made under fear of impending danger caused by the action of the other vessel, which are acts done in extremis, and which will not be accounted faults, nor relieve the vessel whose action causes them. See the Jupiter, Case No. 7,585; The Western Metropolis, Id. 17,440; The Nichols, 7 Wall. (74 U. S.) 656.]

3. That there is no proof that the failure of the schooner to carry the lights required by the British merchants' shipping act misled the brig, or in any way contributed to the disaster.

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

4. That that act had no application to the equipment or conduct of this British schooner when meeting a foreign ship on the high seas.

[Cited in The Scotia, Case No. 12,513; Leonard v. Whitwell, Id. 8,261; The Belgenland, 114 U. S. 369, 5 Sup. Ct. 860; The Athabasca, 45 Fed. 656. See, also, Thomassen v. Whitwell, Case No. 13,929; Churchill v. The British America, Id. 2,715.]

5. Whether it would have an application to collisions between British and American vessels since the passage of the act of congress in the same subject—Quere?

[In admiralty. Libel by the Pacific Mutual Insurance Company against the brig Belle. Decree for libellants.]

The facts of this case are stated in the opinion of the court.

A. L. Edwards, for libellants.
Beebe, Dean & Donohue, for claimants.

SHIPMAN, District Judge. On the evening of the 22d of November, 1862, a collision occurred between the schooner Tempest and the brig Belle, off the New Jersey shore, between Barnegat and Sandy Hook. The schooner was sunk. She was insured by the Pacific Mutual Insurance Company. They paid the loss under the policy, and as assignees, subrogated to the rights of the owners of the schooner in the premises, they bring this suit to recover the damages resulting from the collision.

The Tempest was bound from Nassau to New York, and took on board Captain Murray, an experienced Sandy Hook pilot, some time before the collision. He immediately took charge of her navigation, and continued in charge until the accident.

He states that the wind was about N. W. by W., and the schooner close-hauled, with a light at the end of her bowsprit; that he kept her close by the wind. About seven o'clock he discovered the light of an approaching vessel, which proved to be the brig Belle, in the neighborhood of a mile off, coming down the coast, and approaching the Tempest nearly head and head; that he kept his vessel close by the wind until the brig had approached so near that a collision was imminent, when he ordered his wheel hard a-port and attempted to slack off the main sheet, in order, if possible to clear her; but that it was impossible to do so, and that though his wheel was put hard up, the Tempest had fallen off but little, when the Belle struck her stem on, near the port cathead, at an angle of about two points, and cut into her fifteen or twenty feet, knocking out her foremast, and sinking her in a few minutes. I find nothing in the other proofs that, in my judgment, materially shakes the statement of the pilot. On the other hand, I think that the testimony of Captain Yates, of the Belle, when carefully considered, tends to show that there was no material change in the course of either vessel until the Tempest's

wheel was put hard a-port. The pilot of the Tempest says there was no change of her course till that time, and if there was any change of the course of the Belle, it was so small as to still leave the vessels approaching each other nearly head and head. The Belle having the wind free, and the Tempest being close-hauled, it was the duty of the former to keep out of the way. This is so well settled that a citation of authorities would be superfluous.

It was equally the duty of the Tempest to hold her course, and allow the Belle to choose which side of her she would pass. She did so, as I understand the proofs, until it became evident that a collision must take place unless something was done. She then ported her helm. Whether some other manoeuvre on her part might not have proved more successful, this court will not stop to inquire. The movement was made in a moment of alarm and of imminent and overwhelming peril—peril into which the vessel had been brought by the fault of the Belle and by no fault of the Tempest. The error of a vessel thus brought into immediate jeopardy by the fault of another, committed in a moment of alarm, will not subject her to damages nor prevent her recovery. This is a perfectly familiar principle of constant application by courts of admiralty.

The duty of the Belle was obvious and simple. She discovered the light of the Tempest in ample time to have cleared her. To accomplish this she should have taken such early and decided measures as would prevent both the danger and alarm. She failed to do this, and must be pronounced in fault and responsible for the consequences.

The claimants insist that upon the proofs the Tempest must be regarded as a British vessel, and that as she failed to carry the colored lights prescribed by the act of parliament, she can not recover. Assuming that the Tempest was a British vessel, there are two answers to this claim of the defence:

First.—There is no proof whatever that the failure to carry the colored lights prescribed by the British merchants' shipping act misled the Belle, or in any way contributed to produce the disaster.

Second.—The act of parliament in question has no application to the equipment or conduct of a British ship when meeting a foreign ship on the high seas, and can furnish no rule by which the merits of a controversy growing out of a collision with a foreign vessel can be tested. This has been repeatedly decided by the English courts.

In the case of The Saxonia, 1 Lush. 414, this question was considered, and Dr. Lushington remarked: "When a British and foreign ship meet on the high seas, the usual rule is that the statute is not binding; clearly it is not binding on the foreigner; and if it were considered binding on the British vessel, the British vessel would manifestly be under an undue disadvantage. I believe the practice of applying the maritime law to such cases has been followed universally up to the present moment, and I hold such to be the law." This case was affirmed on appeal by the privy council, the master of the rolls delivering the judgment, in the course of which he says: "We are of opinion that this collision must be considered to have taken place on the high seas, in a place where a foreign vessel has a right of sailing without being bound by any of the provisions of the statutes enacted to govern British ships. This being so, it follows that the merchants' shipping act has no application to this case, as it has been fully determined that where a British and foreign ship meet on the high seas, the statute is not binding upon either. The principle, therefore, by which this case must be decided, must be found in the ordinary rules of the sea." 1 Lush. 421, 422. The same doctrine was laid down by the high court of admiralty in The Dumfries, Swab. 63; and in The Zollverein, Swab. 96. To the same point is the case of The Chancellor, 14 Moore, P. C. 202. The only case I find in the English reports where a contrary doctrine is held, is that of The Cleadon, 1 Lush. 158. In this latter case the point seems to have been passed upon without much attention, and without reference to the fact that it had been decided the other way by the high court of admiralty. The weight of authority is decidedly in favor of the doctrine that the statute has no application to the case of a British ship meeting a foreign ship on the high seas; upon principle, I think this is correct.

Of course this exposition of the law refers to the state of things existing on the date of this collision, 1862. Since then, the United States, as well as other nations, has passed laws similar to those of Great Britain, relating to the lights which sailing vessels are bound to carry.

Let a decree be entered for the libellants with an order of reference to a commissioner to compute the damages.