## THE BELGENLAND.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Argued January 16, 1885.—Decided April 13, 1885.

A collition on the high seas between vessels of different nationalities is *prima facie* a proper subject of inquiry in any court of Admiralty which first obtains jurisdiction.

The Courts of the United States in Admiralty may, in their discretion, take jurisdiction over a collision on the high seas between two foreign vessels.

Statement of Facts.

Among the circumstances which may determine a court below in exercising its discretion to take or refuse jurisdiction over foreign vessels, their officers and crew in ports of the United States are : (1) That both vessels are subject to the laws of the same country, and that resort may be had to its courts without difficulty ; (2) That the disputes are between seamen and the master, and that, in the absence of a treaty, the consul of the country does not assent to the jurisdiction (but this assent, in the absence of a treaty, is not necessary when the complaint is for arbitrary dismissal or acts of cruelty); (3) When the jurisdiction is invoked for matters which affect only parties on the vessel, and which have to be determined by the laws of the country to which the vessel belongs.

When a controversy in Admiralty between foreign vessels in the courts of the United States arises under the common law of nations, the court below should take jurisdiction, unless special grounds are shown why it should not do so.

When the court below has taken jurisdiction in case of a collision between two foreign vessels on the high seas, it is incumbent on the party appealing to this court, and questioning the jurisdiction, to show that the court below exercised its discretion to take jurisdiction on wrong principles, or acted so differently from the view held here, that it may justly be held to have exercised it wrongfully.

In a proceeding in Admiralty against one foreign vessel for collision with another foreign vessel on the high seas, the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted, is the law governing the case ; except : (1) That persons on either ship will not be open to blame for following the sailing regulations and rules of navigation prescribed by their own government for their direction on the high seas ; and, (2) That if the maritime law, as administered by both nations to which the respective ships belong, be the same in both, in respect to any matter of liability or obligation, such law, if shown to the court, should be followed, although different from the maritime law of the country of the forum.

When facts found by the court below furnish conclusive proof of negligence, negligence may be regarded as among the conclusions of law to be legally inferred from those facts.

This case grew out of a collision which took place on the high seas between the Norwegian barque Luna and the Belgian steamship Belgenland, by which the former was run down and sunk. Part of the crew of the Luna, including the master, were rescued by the Belgenland and brought to Philadelphia. The master immediately libelled the steamship on behalf of the owners of the Luna and her cargo, and her surviving crew, in a cause civil and maritime.

Statement of Facts.

The libel stated in substance that the barque Luna, of 359 tons, was on a voyage from Porto Rico to Queenstown, or Falmouth, with a cargo of sugar, and when in latitude 44° 33', and longitude 21° 43', was met by the steamship Belgenland, end on, between one and two in the morning, and was run down and sunk by her, only five of her crew escaping; that the light of the steamship was observed right ahead when a mile or more off; that the barque kept her course as was her duty to do; and that the steamship took no measures to avoid her, but came on at full speed until she struck the Luna; and that the collision was altogether the fault of those in charge of the steamship.

The master of the Belgenland appeared for her owners, and filed an answer, denying that the Luna, at the time of the collision, was sailing on the course alleged, and averred that she was crossing the bows of the steamship, and must have changed her course, and that this was the cause of the collision; that the Luna was not discovered until the instant of the collision, when it was too late to alter the course of the steamship; and that the reason why the barque was not seen before was, that she was enveloped in a shower of rain and mist; and that the steamship was plunging into a heavy head sea, throwing water over her turtle deck forward.

The proctor for the Belgenland, at the time of filing his answer, excepted to the jurisdiction of the court, and stated for cause, that the alleged collision took place between foreign vessels on the high seas, and not within the jurisdiction of the United States; that the Belgenland was a Belgian vessel, belonging to the port of Antwerp, in the Kingdom of Belgium, running a regular line between Antwerp and the ports of New York and Philadelphia; and that the bark Luna was a Norwegian vessel, and that no American citizen was interested in the barque or her cargo.

The District Court decided in favor of the libellant, and rendered a decree for the various parties interested, to the aggregate amount of $50,278.23. An appeal was taken to the Circuit Court, which found the following facts, to wit:

"1. Between one and two o'clock in the morning of Sep-

tember 3, 1879, in mid ocean, a collision occurred between the Norwegian barque Luna, on her voyage from Humacao, in Porto Rico, to Queenstown or Falmouth, and the steamship Belgenland, on a voyage from Antwerp to Philadelphia, which resulted in the sinking of the barque, in the total loss of the vessel and her cargo, and in the drowning of five of her crew.

" 2. The wind was between S. W. and W. S. W., and there was not much sea, but a heavy swell. The bark was running free, heading S. E. by E. half E., having the wind on her starboard quarter. All her square sails were set except her main royal, and she carried also her fore, main, and mizzen stay sails and inner jib. Her yards were braced a little, her main sheet was down but the weather-clew was up. She was making about seven and one-half knots. Her watch on deck consisted of the first mate and three men; an able seaman was on the lookout on the top-gallant forecastle, and a capable helmsman was at the wheel.

" She carried a red light on her port side and a green light on her starboard side, properly set and burning brightly, which could be seen, on a dark night, and with a clear atmosphere, at least two miles. The character and location of these lights conformed to the regulations of the barque's nationality, which are the same as those of the British Board of Trade. About 1.45 o'clock the look out sighted the white masthead light of a steamer right ahead, distant, as he thought, about a mile, and reported it at once to the mate, who cautioned the man at the wheel to 'keep her steady and be very careful,' and the barque held her course.

"No side lights on the steamer were seen from the barque, but, as the vessels approached each other, the white light of the steamer gradually drew a little on the port bow of the barque for three or four minutes. The mate of the barque seeing the steamer's sails, and that she was heading directly for the barque, was close aboard of her, and reasonably apprehending that a collision was inevitable, ordered the barque's helm hard a-port. In a few seconds the steamer's starboard light came into view, and in another instant she struck the barque on her

port side, cutting her in two obliquely from the after part of her fore rigging to the fore part of the main rigging.

" 3. The Belgenland was steering N. W. by W. half W. by compass, and making about eleven knots. Her second officer had charge of the deck, and his watch was composed of ten able seamen, two quartermasters, the second boatswain, and the fourth officer. One able seamen was stationed on the lee or starboard side of the bridge as a lookout. The second officer was on the bridge. The fourth officer was stationed at the after or standard compass, which was near the mizzen-mast, but at the time·was on the bridge, having come there to report a.cast of the log. A quartermaster was at the wheel. The rest of the watch were underneath the turtle-back or topgallant forecastle.

" The steamer was four hundred and sixteen feet long and about thirty-eight feet beam. The bridge was one hundred and fifty or one hundred and eighty feet from her bow, and was six or seven feet higher than the top of the turtle-back, which was about twenty-five feet above the water.

" The steamer had her fore, main and mizzen try-sails, fore stay sails and jib set and drawing, and probably her jigger also. She heeled to starboard from ten to fifteen degrees.

" 4. The only lookout on the steamer was on the bridge. None was on the turtle-back, although it would have been entirely safe to station one there, for the alleged reason that the vessel was plunging into a head sea, and taking so much water over her bows that he would have been of no use there.

" 5. The barque was not seen by those in charge of the steamer until just at the instant of the collision, when the second officer saw her head sails just across the steamer's bow, the lookout in the lee side of the bridge saw her after sails and stern.

" 6. The moon was up, but was obscured by clouds. There was no fog, but occasional rain with mist, and the wind was blowing from the S. W. to W. S. W.

" 7. Objects could be seen at the distance of from five hundred yards to a mile. The masthead light of the steamer was sighted and at once reported by the lookout on the barque, at the distance of about a mile; the port light of the barque was

seen by a steerage passenger on the steamer, looking out of his room just under the bridge, and reported to his room mates long enough before the collision to enable the second steerage steward, who heard the report, to go up the companion ladder, cross the deck, and reach the steamer's rail; after the collision, the mizzen-mast of the barque was all of her above water, and this was distinctly seen from the steamer when she was at the distance of five hundred yards from it.

"8. The damages caused by the collision were assessed at $50,248.23."

Upon these facts the court below deduced the following conclusions:

"1. That the vessels were approaching each other from opposite directions, upon lines so close to each other as to involve the necessity of a deflection by one or the other of them to avoid a collision.

"2. That the lookout on the barque saw the steamer when she was nearly a mile distant, and she was held steadily on her course, and that she thereby fulfilled her legal obligation. Even if her helm was ported, it was at a time and under circumstances which did not involve any culpability on her part.

"3. That it was the duty of the steamer to keep out of the way of the barque, and, to that end, so to change her course as to preclude all danger of collision.

"4. That the barque could and ought to have been seen by the steamer when they were sufficiently distant from each other to enable the steamer to give the barque enough sea room to avert any risk of collision. In this failure to observe the barque the steamer was negligent.

"5. No satisfactory or sufficient reason is furnished by the respondent's evidence for this failure of observation. If it resulted from the inattention of the steamer's lookout, or because their vision was intercepted by her fore try-sail, she was clearly culpable. If it is explicable by the condition of the atmosphere, no matter by what cause it was produced, it was the steamer's duty to reduce her speed, and to place a lookout on her turtleback. An omission to observe these precautions was negligence.

" But, considering the proof that the barque held her course, and that the steamer might have seen her by proper vigilance, when suitable precaution against collision might have been taken, a mere speculative explanation of the steamer's presumptive culpability cannot be accepted as sufficient."

A decree was thereupon entered, affirming the decree of the District Court in favor of the libellants for the sum of $50,748.23, with interest from March 25, 1881, amounting to $51,954.14, and costs.   9 Fed. Rep. 126.

A reargument was had on the question of jurisdiction, and the court held and decided that the Admiralty Courts of the United States have jurisdiction of collisions occurring on the high seas between vessels owned by foreigners of different nationalities; and overruled the plea to the jurisdiction.   9 Fed. Rep. 576.   The case was brought before this court on appeal from the decree of the Circuit Court.   See also 108 U. S. 153.

*Mr. Morton P. Henry* and *Mr. Henry R. Edmunds* for appellants.

*Mr. Henry Flanders* and *Mr. J. Langdon Ward* for appellee.

Mr. JUSTICE BRADLEY delivered the opinion of the court. He stated the facts in the foregoing language, and continued :

The first question to be considered is that of the jurisdiction of the District Court to hear and determine the cause.

It is unnecessary here, and would be out of place, to examine the question which has so often engaged the attention of the common law courts, whether, and in what cases, the courts of one country should take cognizance of controversies arising in a foreign country, or in places outside of the jurisdiction of any country.   It is very fully discussed in *Mostyn* v. *Fabrigas*, Cowp. 161, and the notes thereto in 1 Smith's Leading Cases, 340; and an instructive analysis of the law will be found in the elaborate arguments of counsel in the case of the San Francisco Vigilant Committee, *Malony* v. *Dows*, 8 Abbott Pr. 316, argued before Judge Daly in New York, 1859.   We shall content ourselves with inquiring what rule is followed by Courts of

Admiralty in dealing with maritime causes arising between foreigners and others on the high seas.

This question is not a new one in these courts. Sir William Scott had occasion to pass upon it in 1799. An American ship was taken by the French on a voyage from Philadelphia to London, and afterwards rescued by her crew, carried to England, and libelled for salvage; and the court entertained jurisdiction. The crew, however, though engaged in the American ship, were British born subjects, and weight was given to this circumstance in the disposition of the case. The judge, however, made the following remarks: "But it is asked, if they were American seamen would this court hold plea of their demands? It may be time enough to answer this question whenever the fact occurs. In the meantime, I will say without scruple that I can see no inconvenience that would arise if a British court of justice was to hold plea in such a case; or conversely, if American courts were to hold pleas of this nature respecting the merits of British seamen on such occasions. For salvage is a question of *jus gentium*, and materially different from the question of a mariner's contract, which is a creature of the particular institutions of the country, to be applied and construed and explained by its own particular rules. There might be good reason, therefore, for this court to decline to interfere in such cases, and to remit them to their own domestic forum; but this is a general claim, upon the general ground of *quantum meruit*, to be governed by a sound discretion, acting on general principles; and I can see no reason why one country should be afraid to trust to the equity of the courts of another on such a question, of such a nature, so to be determined." *The Two Friends*, 1 Ch. Rob., 271, 278.

The law has become settled very much in accord with these views. That was a case of salvage; but the same principles would seem to apply to the case of destroying or injuring a ship, as to that of saving it. Both, when acted on the high seas, between persons of different nationalities, come within the domain of the general law of nations, or *communis juris*, and are *prima facie* proper subjects of inquiry in any Court of Admiralty which first obtains jurisdiction of the rescued or

offending ship at the solicitation in justice of the meritorious, or injured, parties.

The same question of jurisdiction arose in another salvage case which came before this court in 1804, *Mason* v. *The Blaireau*, 2 Cranch, 240. There a French ship was saved by a British ship, and brought into a port of the United States; and the question of jurisdiction was raised by Mr. Martin, of Maryland, who, however, did not press the point, and referred to the observations of Sir William Scott in *The Two Friends*. Chief Justice Marshall, speaking for the court, disposed of the question as follows: "A doubt has been suggested," said he, "respecting the jurisdiction of the court, and upon a reference to the authorities, the point does not appear to have been ever settled. These doubts seem rather founded on the idea that upon principles of general policy, this court ought not to take cognizance of a case entirely between foreigners, than from any positive incapacity to do so. On weighing the considerations drawn from public convenience, those in favor of the jurisdiction appear much to over-balance those against it, and it is the opinion of this court, that, whatever doubts may exist in a case where the jurisdiction may be objected to, there ought to be none where the parties assent to it." In that case, the objection had not been taken in the first instance, as it was in the present. But we do not see how that circumstance can affect the jurisdiction of the court, however much it may influence its discretion in taking jurisdiction.

For circumstances often exist which render it inexpedient for the court to take jurisdiction of controversies between foreigners in cases not arising in the country of the forum; as, where they are governed by the laws of the country to which the parties belong, and there is no difficulty in a resort to its courts; or where they have agreed to resort to no other tribunals. The cases of foreign seamen suing for wages, or because of ill treatment, are often in this category; and the consent of their consul, or minister, is frequently required before the court will proceed to entertain jurisdiction; not on the ground that it has not jurisdiction; but that, from motives of convenience or international comity, it will use its discretion whether to exercise

jurisdiction or not; and where the voyage is ended, or the sea-
men have been dismissed or treated with great cruelty, it will
entertain jurisdiction even against the protest of the consul.
This branch of the subject will be found discussed in the fol-
lowing cases.: *The. Catherina,* 1 Pet. Adm. 104; *The Försöket,*
1 Pet. Adm. 197; *The St. Oloff,* 2 Pet. Adm. 428; *The Golub-
chick,* 1 W. Rob. 143; *The Nina,* L. R. 2 Adm. and Eccl. 44;
*S. C.* on appeal, L. R. 2 Priv. Co. 38; *The Leon XIII.,* 8 Prob.
Div. 121; *The Havana,* 1 Sprague, 402; *The Becherdass Am-
baidass,* 1 Lowell, 569; *The Pawashick,* 2 Lowell, 142.

Of course, if any treaty stipulations exist between the United
States and the country to which a foreign ship belongs, with
regard to the right of the consul of that country to adjudge
controversies arising between the master and crew, or other
matters occurring on the ship exclusively subject to the foreign
law, such stipulations should be fairly and faithfully observed.
*The Elwin Kreplin,* 9 Blatchford, 438, reversing *S. C.* 4 Ben.
413; see *S. C.* on application for mandamus, *Ex parte New-
man,* 14 Wall. 152. Many public engagements of this kind
have been entered into between our government and foreign
States. See Treaties and Conventions, Rev. Ed. 1873, Index,
1238.

In the absence of such treaty stipulations, however, the case
of foreign seamen is undoubtedly a special one, when they sue
for wages under a contract which is generally strict in its char-
acter, and framed according to the laws of the country to
which the ship belongs; framed also with a view to secure, in
accordance with those laws, the rights and interests of the
ship-owners as well as those of master and crew, as well when
the ship is abroad as when she is at home. Nor is this special
character of the case entirely absent when foreign seamen sue
the master of their ship for ill-treatment. On general princi-
ples of comity, Admiralty Courts of other countries will not
interfere between the parties in such cases unless there is spe-
cial reason for doing so, and will require the foreign consul to
be notified, and, though not absolutely bound by, will always
pay due respect to, his wishes as to taking jurisdiction.

Not alone, however, in cases of complaints made by foreign

seamen, but in other cases also, where the subjects of a particular nation invoke the aid of our tribunals to adjudicate between them and their fellow subjects, as to matters of contract or tort solely affecting themselves and determinable by their own laws, such tribunals will exercise their discretion whether to take cognizance of such matters or not. A salvage case of this kind came before the United States District Court of New York in 1848. The master and crew of a British ship found another British ship near the English coast apparently abandoned (though another vessel was in sight), and took off a portion of her cargo, brought it to New York, and libeled it for salvage. The British consul and some owners of the cargo intervened and protested against the jurisdiction, and Judge Betts discharged the case, delivered the property to the owners upon security given, and left the salvors to pursue their remedy in the English courts. *One hundred and Ninety-four Shawls,* 1 Abbott, Adm. 317.

So in a question of ownership of a foreign vessel, agitated between the subjects of the nation to which the vessel belonged, the English Admiralty, upon objection being made to its jurisdiction, refused to interfere, the consul of such foreign nation having declined to give his consent to the proceedings. *The Agincourt,* 2 Prob. Div., 239. But in another case, where there had been an adjudication of the ownership under a mortgage in the foreign country, and the consul of that country requested the English court to take jurisdiction of the case upon a libel filed by the mortgagee, whom the owners had dispossessed, the court took jurisdiction accordingly. *The Evangelistria,* 2 Prob. Div., 241, note.

But, although the courts will use a discretion about assuming jurisdiction of controversies between foreigners in cases arising beyond the territorial jurisdiction of the country to which the courts belong, yet where such controversies are *communis juris,* that is, where they arise under the common law of nations, special grounds should appear to induce the court to deny its aid to a foreign suitor when it has jurisdiction of the ship or party charged. The existence of jurisdiction in all such cases is beyond dispute; the only question will be, whether it is ex-

pedient to exercise it. See 2 Parsons Ship. and Adm., 226, and cases cited in notes. In the case of *The Jerusalem*, 2 Gall. 191, decided by Mr. Justice Story, jurisdiction was exercised in the case of a bottomry bond, although the contract was made between subjects of the Sublime Porte, and it did not appear that it was intended that the vessel should come to the United States. In this case Justice Story examined the subject very fully, and came to the conclusion that, wherever there is a maritime lien on the ship, an Admiralty Court can take jurisdiction on the principle of the civil law, that in proceedings *in rem* the proper forum is the *locus rei sitæ*. He added: "With reference, therefore, to what may be deemed the public law of Europe, a proceeding *in rem* may well be maintained in our courts where the property of a foreigner is within our jurisdiction. Nor am I able to perceive how the exercise of such judicial authority clashes with any principles of public policy." That, as we have seen, was a case of bottomry, and Justice Story, in answer to the objection that the contract might have been entered into in reference to the foreign law, after showing that such law might be proven here, said: "In respect to maritime contracts, there is still less reason to decline the jurisdiction, for in almost all civilized countries these are in general substantially governed by the same rules."

Justice Story's decision in this case was referred to by Dr. Lushington with strong approbation in the case of *The Golubchick*, 1 W. Rob. 143, decided in 1840, and was adopted as authority for his taking jurisdiction in that case.

In 1839, a case of collision on the high seas between two foreign ships of different countries (the very case now under consideration) came before the English Admiralty. *The Johann Friederich*, 1 W. Rob. 35. A Danish ship was sunk by a Bremen ship, and on the latter being libelled, the respondents entered a protest against the jurisdiction of the court. But jurisdiction was retained by Dr. Lushington, who, amongst other things, remarked: "An alien friend is entitled to sue [in our courts] on the same footing as a British born subject, and if the foreigner in this case had been resident here, and the cause of action had originated *infra corpus comitatus*, no ob-

jection could have been taken." Reference being made to the observations of Lord Stowell in cases of seamen's wages, the judge said: "All questions of collision are questions *communis juris;* but in case of mariners' wages, whoever engages voluntarily to serve on board a foreign ship, necessarily undertakes to be bound by the law of the country to which such ship belongs, and the legality of his claim must be tried by such law. One of the most important distinctions, therefore, respecting cases where both parties are foreigners is, whether the case be *communis juris* or not. . . . If these parties must wait until the vessel that has done the injury returned to its own country, their remedy might be altogether lost, for she might never return, and, if she did, there is no part of the world to which they might not be sent for their redress."

In the subsequent case of *The Griefswald,* 1 Swabey, 430, decided by the same judge in 1859, which arose out of a collision between a British barque and a Persian ship in the Dardanelles, Dr. Lushington said: "In cases of collision, it has been the practice of this country, and, so far as I know, of the European States and of the United States of America, to allow a party alleging grievance by a collision to proceed *in rem* against the ship wherever found, and this practice, it is manifest, is most conducive to justice, because in very many cases a remedy *in personam* would be impracticable."

The subject has frequently been before our own Admiralty Courts of original jurisdiction, and there has been but one opinion expressed, namely, that they have jurisdiction in such cases, and that they will exercise it unless special circumstances exist to show that justice would be better subserved by declining it. It was exercised in two cases of collision coming before Mr. Justice Blatchford, whilst District Judge of the Southern District of New York, *The Jupiter,* 1 Ben. 536, and *The Steamship Russia,* 3 Ben. 471. In the former case the law was taken very much for granted; in the latter it was tersely and accurately expounded, with a reference to the principal authorities. Other cases might be referred to, but it is unnecessary to cite them. The general doctrine on the subject is recognized in the case of *The Maggie Hammond,* 9 Wall.

435, 457, and is accurately stated by Chief Justice Taney in his dissenting opinion in *Taylor* v. *Carryl*, 20 How. 583, 611.

As the assumption of jurisdiction in such cases depends so largely on the discretion of the court of first instance, it is necessary to inquire how far an appellate court should undertake to review its action. We are not without authority of a very high character on this point. In a quite recent case in England, that of *The Leon XIII.*, 8 Prob. Div. 121, the subject was discussed in the Court of Appeal. That was the case of a Spanish vessel libelled for the wages of certain British seamen who had shipped on board of her, and the Spanish consul at Liverpool protested against the jurisdiction of the Admiralty Court on the ground that the shipping articles were a Spanish contract, to be governed by Spanish law, and any controversy arising thereon could only be settled before a Spanish court, or consul. Sir Robert Phillimore held that the seamen were to be regarded for that case as Spanish subjects, and, under the circumstances, he considered the protest a proper one and dismissed the suit. The Court of Appeal held that the judge below was right in regarding the libellants as Spanish subjects; and on the question of reviewing his exercise of discretion in refusing to take jurisdiction of the case, Brett, M. R. said: "It is then said that the learned judge has exercised his discretion wrongly. What then is the rule as regards this point in the Court of Appeal? The plaintiffs must show that the judge has exercised his discretion on wrong principles, or that he has acted so absolutely differently from the view which the Court of Appeal holds, that they are justified in saying he has exercised it wrongly. I cannot see that any wrong principle has been acted on by the learned judge, or anything done in the exercise of his discretion so unjust or unfair as to entitle us to overrule his discretion."

This seems to us to be a very sound view of the subject; and acting on this principle, we certainly see nothing in the course taken by the District Court in assuming jurisdiction of the present case, which calls for animadversion. Indeed, where the parties are not only foreigners, but belong to different nations, and the injury or salvage service takes place on

the high seas, there seems to be no good reason why the party injured, or doing the service, should ever be denied justice in our courts. Neither party has any peculiar claim to be judged by the municipal law of his own country, since the case is pre-eminently one *communis juris*, and can generally be more impartially and satisfactorily adjudicated by the court of a third nation having jurisdiction of the *res* or parties, than it could be by the courts of either of the nations to which the litigants belong. As Judge Deady very justly said, in a case before him in the district of Oregon : "The parties cannot be remitted to a home forum, for, being subjects of different governments, there is no such tribunal. The forum which is common to them both by the *jus gentium* is any court of admiralty within the reach of whose process they may both be found." *Bernhard* v. *Greene*, 3 Sawyer, 230, 235.

As to the law which should be applied in cases between parties, or ships, of different nationalities, arising on the high seas, not within the jurisdiction of any nation, there can be no doubt that it must be the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted. This rule is laid down in many cases; amongst others the following : *The Johann Friederich*, 1 W. Rob. 35 ; *The Dumfries*, 1 Swabey, 63 ; *The Zollverein*, 1 Swabey, 96 ; *The Griefswald*, 1 Swabey, 430 ; *The Wild Ranger*, Lush. 553 ; *The Belle*, 1 Ben. 317, 320 ; *The Scotia*, 14 Wall. 170 ; *The Scotland*, 105 U. S. 24, 29 ; *The Leon*, 6 Prob. Div. 148. In the case last cited, which was that of a British ship run down by the Leon, a Spanish ship, the question was specifically raised by the respondents, (the owners of the Leon,) who set up in defence, that if there was any negligence in her navigation, her master and crew, and not her owners, were liable by the Spanish law. This defence was overruled, and the general maritime law, as understood and administered in England, was held to govern the case; by which law the owners were held responsible. The same rule was followed by this court in *The Scotland*, and was applied to the collision of a British with an American ship on the high seas; although, it is true, we applied to that case the rule of limited liability estab-

lished by the act of Congress, regarding that act as declarative
of the general maritime law to be administered by our courts.

The rule requiring the application of the general maritime
law to such cases has some qualifications, which, though not
affecting the present case, should always be borne in mind.
One of these qualifications is, that the persons in charge of
either ship will not be open to blame for following the sailing
regulations and rules of navigation prescribed by their own
government for their direction on the high seas; because they
are bound to obey such regulations. *The Scotia,* 14 Wall. 170,
184. Another qualification is, that if the maritime law, as
administered by both nations to which the respective ships
belong, be the same in both in respect to any matter of liability
or obligation, such law, if shown to the court, should be followed
in that matter in respect to which they so agree, though it differ
from the maritime law as understood in the country of the
forum; for, as respects the parties concerned, it is the maritime
law which they mutually acknowledge. *The Scotland,* 105 U
S. 24, 31.

The first of these qualifications can rarely be called into
requisition at the present day, since, for more than twenty years
past, all the principal maritime nations of the world (at least
those whose vessels navigate the Atlantic Ocean) have con-
curred in adopting a uniform set of rules and regulations for
the government of vessels on the high seas. These rules and
regulations have become international, and virtually a part of
the maritime law. *The Scotia,* 14 Wall. 170, 187. They will
be presumed to be binding upon foreign as well as domestic
ships unless the contrary is made to appear.*

We are then brought to the question of the merits of the
case between the parties as shown by the pleadings and finding

---

* *Note by the Court.*—The International Rules of 1863, Abbott on Shipping,
11th Ed., App. CCCLXIX; 13 Rev. Stat. 58, were revised by an Order of Council
in England, in August, 1879, to take effect from the 1st of September, 1880,
and as thus revised have been adopted by most commercial nations. See 4 Prob.
Div. 241–249. They were adopted for both public and private vessels of the
United States by act of Congress approved March 3, 1885. Public Act, No. 100.
They had been adopted for public vessels before. See Luce's Seamanship, 360,
Ed. 1884.

of facts. And this does not require any extended discussion. It is shown that the barque had her proper lights burning brightly, visible on a dark night, and with a clear atmosphere, at least two miles; and that, in character and location, they conformed to the regulations of the barque's nationality, which are the same as those of the British Board of Trade (or the International Rules before referred to); that the mast-head light of the steamer was sighted right ahead, distant about a mile; that the barque was kept steady on her course until the steamer was almost upon her and apparently about to run her down; that then the order was given to put the helm hard a-port; that in a few seconds the steamer's starboard light came in view, and in another instant she struck the barque in her port side, cutting her in two obliquely. In all this we see nothing that the people in charge of the barque did which it was not their duty to do by the International Rules. It was their duty to keep her steady on her course, and it was the duty of the steamer to see the barque and to avoid a collision.

On the other side it appears that the steamer, which was a large and powerful one, 416 feet long and 38 feet beam, was coming towards the barque, end on, at about eleven knots an hour; that she had a lookout on the lee side of her bridge (which was over 150 feet from her bow), where the officer in charge of the deck also was; but had no other lookout on duty, the rest of the watch, except the man at the compass, and one at the wheel, were underneath the turtle-back, or top-gallant forecastle. No lookout was on the turtle-back, although it would have been entirely safe to station one there. The omission to do so was for the alleged reason that the vessel was plunging into a head-sea, and taking so much water over her bows that he would have been of no use there. The barque was not seen by those in charge of the steamer until just at the instant of the collision; yet objects could be seen at a distance of from 500 yards to a mile, and the port light of the barque was seen by a steerage passenger on the steamer, looking out of his room just under the bridge, and was reported to his room mates long enough before the collision to enable the second steerage steward, who heard the report, to go up the

companion-ladder, cross the deck, and reach the steamer's rail.

We think that these facts furnished a sufficient ground for the conclusions at which the court arrived, as before rehearsed; the substance of which was that the collision occurred by the negligence of those having charge of the Belgenland, in not seeing the barque, and in not taking the proper precautions due to such a night and such a sea, by reducing speed and keeping a sufficient lookout.

It is argued that there is no express finding of negligence, or fault, as matter of fact, but only as an inference from the facts found. But we think that the facts found furnish such conclusive proof of negligence that it may be regarded as properly found amongst the conclusions of law as a legal inference from those facts. *United States* v. *Pugh*, 99 U. S. 265.

The counsel of the appellants suppose that the court below found the Belgenland in fault on the mere presumption arising from the fact of collision, and the primary duty of the steamship to avoid it. But this is not a just view of the decision. There was much more in the facts of the case than the existence of such a presumption, as the foregoing rehearsal of the facts clearly shows. The ability to see objects at a distance; the fact that the men in charge of the steamer failed to see the barque, whilst a passenger did see her from his room; the fact that there was but one lookout for such a large steamer; that other lookouts could have been stationed on the turtle-back; the fact that the speed was not slackened, and no precautions taken to get a better view ahead; these facts, in addition to the presumption arising from the steamer's duty, present a very different case from that supposed by the appellants. The decision of the court must be taken as the collective result from the whole case. It cannot be judged from mere isolated expressions in the opinion.

The rule contended for by the appellants, that negligence and fault must be proved, and not presumed, is undoubtedly a sound one, and hardly needs cases to support it. But the Circuit Court evidently did not rest the case on presumption, but upon proof, from which it properly deduced negligence on

the part of the steamship. At all events, this court, upon a careful consideration of the facts found, is satisfied that there was such negligence, and that it was the cause of the catastrophe.

*The decree of the Circuit Court is affirmed, with interest to be added to the amount from the date of the same.*