.J. S. LOW *v.* THE STEAMSHIP CLAUDINE and THE WILDER STEAMSHIP COMPANY,

and

JOHN PILTZ *v. Id.*

DECIDED: DECEMBER 20, 1900.

1.  In an action against a steamer for a collision with a barkentine in the night time in which the barkentine was sunk with all her cargo, where it appeared from the weight of the evidence that the barkentine had all her lights burning properly, and was sailing in a southwest course when the steamer sighted her, and continued on that course, as was her duty under the regulations; and where it appeared from the testimony of the officer of the deck on the steamer that he had seen the lights of the barkentine some fifteen or twenty minutes before the collision occurred, but was in doubt as to the direction in which they were moving, and who, after watchng the same without making any attempt to change his course or slacken the steamer's speed, which was then at the rate of 10 knots an hour, finally left the deck and went down to the cabin to find the Captain, leaving no one on the deck, excepting the man at the helm, and not finding the Captain, returned to the deck and blew the whistle once to call the attention of the Captain, and within one minute thereafter the collision took place; and where it further appeared that no regular lookout was kept on said steamer, as required by Rule 29 of the Regulations for preventing collisions at sea (Vol. 26, U. S. Stat., P. 320) and Article 24 of the Sailing Regulations (Penal Laws of Hawaii for 1897, P. 540); *Held,* that the collision was due to the negligence and unskillful navigation of the steamship, for which the steamship and her owners are liable.

2.  All vessels should have a competent lookout stationed in such a position that he can descry approaching vessels at the earliest possible moment; and the want of an adequate lookout on board a vessel at sea is culpable neglect on her part, which will *prima facie* render her responsible for injuries received from her while in that condition.
3.  The fact that no lookout was kept on the steamer Claudine was unpardonable negligence, for which there can be no excuse; and by reason of which omission to keep a proper lookout, aside from other reasons, the Claudine and its owners, under the circumstances of this case, must be held responsible for the collision.
4.  The failure to produce vital evidence which is under the exclusive control of one of the parties to the action if not properly explained, is taken strongly against said party especially where it attempts to introduce exhibits which seem to unfairly represent the devices not produced.

IN ADMIRALTY.    DAMAGES FOR COLLISION.

*Paul Neumann*, for libellants.
*Kinney, Ballou & McClanahan*, for libellees.

ESTEE, J.    The foregoing two actions have been tried together, one brought by J. S. Low, as the assignee of the owners of the cargo and of the freight of the barkentine "William Carson," alleged to be valued at $9050, against the Wilder Steamship Company, and the steamship "Claudine" to recover the said $9050, with costs.

The other action is brought by John Piltz, former master of the barkentine "William Carson," against the said libellees, the "Claudine" and the Wilder Steamship Company, to recover the sum of $2474.30, alleged to be the value of certain personal effects lost by him on the barkentine "William Carson" when she was sunk by collision with the steamer "Claudine."

By stipulation between counsel for the respective parties, it was agreed that the two actions might be consolidated and tried together as the most of the testimony in both cases would be substantially the same.

The principal facts upon which the said actions are based appeared to be these:—

The barkentine "William Carson," Captain John Piltz commanding, owned by George U. Hind and others, being an American vessel of about 791 tons burthen, was on a voyage between Newcastle, N. S. W. and Honolulu, H. T. While coming down the Molokai channel, sailing free, her alleged course being south-west and going at the rate of between two and a half and three knots an hour, and being within 12 miles of Honolulu, on the evening of the 27th of December, 1899, about 8:40 o'clock p. m., the night being dark, yet clear, she was run into by the "Claudine," a passenger and freight steamer sailing out of the port of Honolulu, for the port of Lahaina, on the Island of Maui,—the "Claudine" was moving at the speed of about ten knots an hour, her general course being east, three-quarters south.

That the said "Claudine" struck the "William Carson" on the starboard bow near the cat head, from which collision the "Carson" was tipped over on her starboard side, thrown upon her beam ends, filled with water, sank and became a total loss with her cargo, freight and all personal effects on board.

That thereafter the Wilder Steamship Company, the owner of the "Claudine," bought the wreck of the barkentine at public sale for five hundred and fifty dollars, and a day or two after the collision, fastened a hawser to her stern and towed her stern first into or near the head of the harbor of Honolulu, where she was stripped of her two after masts, her sails and rigging and left sunk in the sea. The collision is admitted, the damage done is not seriously questioned, except as to the amount and value of the articles lost by Captain Piltz of the "Carson."

The allegations of the pleadings upon this proposition are as follows:

The libellant alleges in both cases, that "before and during the time when said collision took place, the said 'William Carson' carried the lights prescribed by law, which lights at the time of the said collision, were brightly burning and could have

been seen by the said 'Claudine' if she had kept a proper look-out for as much as two miles, and in sufficient time for said steamer to avoid the collision."

While the answer alleges in both cases, that the collision occurred "wholly through the fault of the said barkentine 'William Carson,' in that her starboard light was improperly placed and not visible from the steamer 'Claudine' until such time as it was impossible by any maneuvre to avoid a collision."

The issue is thus prevented between the libellants and the libellees as to which vessel was in fault for the collision.

The "William Carson" was a sailing vessel; the "Claudine" was a passenger steamer. It is admitted that the former was coming into the port of Honolulu and the latter going out of said port, and it is claimed the "William Carson" was on a south-west course, while the "Claudine" was on a course east, three-quarters south. If this be true, necessarily they would cross each other's course.

At the trial, Captain Piltz of the "Carson," Nelson the second officer of that ship, and McDonald, the man at the wheel, and in fact all those who were on the deck of the "William Carson" when the collision occurred, swore positively that the ship's course was south-west. This positive testimony of the men who must of necessity know the facts is contradicted only by some sea-captains, most of whom testified in response to hypothetical questions as to the time the lights of the two vessels might have been seen and how they were seen and the consequent course of the vessels arising from supposed conditions. No one of these witnesses was on either vessel at the time of the accident. It also appears in evidence that a south-west course was the correct course for the "William Carson" to take to get into the port of Honolulu, and the evidence seems to be clear that she was sailing that course and did not deviate therefrom at the time of the collision, but that she kept her course as is required by Article 22 of the Sailing Regulations, Penal Laws of Hawaii, (1897) 531, 540; Art. 21 of Sailing Regulations of the United States, vol. 26. Statutes of U. S., page 321.

It may be observed that one of the points most strongly relied upon by the libellees to fix the responsibility for the collision upon the officers and crew of the "William Carson" was, that the ship "Carson" did not have her lights set according to law, because they were not placed upon the ship where they could be seen by the "Claudine" in time to avoid the collision; when the fact is, the second mate of the "Claudine" admits he saw her light a long time before the collision, but that it was not the regulation light.

The legal lights of a sailing vessel as provided by Article 2 of the Regulations for preventing Collisions at Sea, approved Aug. 19, 1890, (Statutes of U. S., vol. 26, page 320, *et seq.*, and Art. 3 of the Sailing Regulations, Penal Laws of Hawaii, 1897, page 532) are the following:

"On the starboard side a green light so constructed as to show an unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the starboard side, and of such a character as to be visible at a distance of at least two miles.

"On the port side a red light so constructed as to show an unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the port side and of such a character as to be visible at a distance of at least two miles.

"That the said green and red lights shall be fitted within board screens projecting at least three feet forward from the light so as to prevent these lights from being  seen  across the bow."

Did the "William Carson" have the lights placed in the manner provided for by the regulations?

Captain Piltz, master of the "Carson," testified that the red and green lights on his ship were "so placed that they could be seen from right ahead two points aft the beam; that they were thirteen feet above the main deck and could be seen two miles away, and were burning on the night of the collision; that they were fastened to the spanker rigging on to the shrouds and the

screens were fastened on to the shrouds;" and further testified that "we carried no other lights."

It was claimed by counsel for libellees both on the trial and in their brief that "the starboard light of the 'Carson' could not by reason of its illegal position be seen from a point right ahead to two points abaft the beam." This is a statutory necessity and should be complied with by every vessel sailing the high seas. "Such a fault," says counsel, "casts the burden of proof as to the responsibility of the accident upon the libellants and that libellees for that reason did not and could not have contributed to the collision."

In their argument, counsel to sustain this position, seem to rely largely upon the case of *St. Louis, etc., v. The United States*, (33 Ct. of Claims, Rep. 251). The case is not before the Court for examination, nor was it before counsel as stated by them,—they simply quote from the syllabus of the case found in the American Digest for 1899, which reads as follows:

"When a vessel has committed a breach of the rule she must show not only that her fault did not probably contribute to the damage, but that it could not have done so."

This seems to be good law, but it is not applicable to the facts in these cases as there is no evidence sufficient to show that there was any breach of the rule upon the part of the "Carson."

The "Claudine" saw a light on the "Carson" in time to stop, slow down or change her course, but she did neither and she cannot now excuse herself by saying that the light was the wrong kind of a light. The clear preponderance of the evidence is that it was a green light that was seen by the second mate of the "Claudine," because no other light was in view on the starboard side of the "Carson."

An examination of the testimony of the officers and men of the "William Carson" shows that there was little doubt as to the kind of lights on the "Carson" that night or that they were properly burning at the time of the collision.

F. A. Nelson, the second mate, testified that the lights of the

"William Carson" were "first class lights and were burning brightly."

Daniel McDonald, able seamen on board the "William Carson," testified that he "was at the wheel from 8 o'clock the night of the accident up to the time of the collision; that he put out the green light before six o'clock on that night."

Andrew Young, an able seaman, testified that "our own lights were burning bright. Both red and green."

Alexander Campbell, the lookout on board the "Carson," testified; "the lights were burning; they were there at eight o'clock."

In the mind of the Court there is no question but what the starboard green light of the ship "William Carson" was burning all of the time that the "Claudine" was in sight of her; but the issue is made as to whether this light was obscured by reason of the mizzen boom and mizzen sail extending over the starboard side of the ship.

It seems that the ship "William Carson" was a new vessel on her first voyage. The United States Inspector at Seattle inspected this vessel before she sailed in accordance with an Act of Congress approved December 21, 1898, and as appears from a certified copy of a certificate of said Inspector introduced in evidence by libellants marked Exhibit A., the Inspector certified that "she was of suitable structure for the service in which she was employed  *  *  *  in a condition to warrant the belief that she may be used in navigation with safety to life * * * and is permitted to navigate the waters of any ocean."

Captain Piltz of the "Carson" testified that "we had the mizzen boom about half way out towards the side of the ship  *  *  * did not have the boom at any time out to the rail because it would not have been safe  *  *  *  the gaff would have swung out too far and would have broken the jaws  *  *  * I never sail with the boom further out than the rail.  *  *  * the sheet and sheet ropes were so cut that the boom could not run over the rail  *  *  * I cut the rope so that it could not go further  *  *  * If I had wanted to pull the boom over

the rail I could not have done so with those sheets.    *    *    *
the boom never was over the rail while I was on board."

Although it appeared at the trial, that all the rigging of the
mizzen boom and mast, including the sheet was saved or could
have been saved by the Wilder Steamship Company, one of the
libellees, as that corporation had bought the wreck and stripped
her, and though the sheet was but a short light rope, and its
production would have settled the question, yet it was not pro-
duced nor its absence explained.

Nothing seems better settled in equity proceedings than that
the non-production of vital evidence which is under the ex-
clusive control of one party, if its absence is not properly ex-
plained, is taken strongly against the party not producing such
evidence, especially in cases like the present, when one party
attempts to introduce exhibits to represent the absent articles
which exhibits seem to unfairly represent the devices which
were thus kept out of Court.    *Jones Law of Evidence*, vol. 1,
sec. 16; *Starkie on Ev.*, 10th. Ed., page 847; *American and
English Ency. of Law*, vol. 27, page 710 and cases there cited.

The sheet rope would have been the very strongest evidence
possible to sustain libellees' contention if their contention was
right.    But the Court holds that the clear weight of the testi-
mony is that the mizzen boom of the "Carson" did not reach
over the side of the ship and did not obscure the starboard light
of the "Carson" but that said light was in plain view on the
night of the collision; and that it was the only light on the "Car-
son" which could be in view on the "Claudine" until it came
so near the "Carson" that her cabin lights were visible.    The
two vessels did not approach each other end on.    In fact Captain
Weisbarth of the "Claudine" placed two models in the same
relative position that he said the ships were in on that night and
the Court caused the Clerk to put paper under the two models
in the presence of counsel and draw a line around each vessel thus
placed, forming a tracing of the position of the vessels according
to his view, which plainly showed that the "Claudine" came
down on the starboard side of the "Carson" and not end on.

This tracing is in the files of the Court. No after thought of explanation can change the open, frank exclamation of the first mate McAllister when he came on the deck of the "Claudine" on the night of the accident, and said "there is her green light, what are you doing on this side of her?" when the "Claudine" was then trying to cross the bow of the "Carson."

The fact is apparent that the second mate of the "Claudine" did not know his duty. He testified that he went on the bridge of the ship "Claudine" by direction of the captain about a quarter to eight p. m. of the night of the collision; that a man by the name of Fischer was at the wheel; that about a quarter past eight (a full half hour before the collision), "I saw a bright light ahead bearing east $\frac{3}{4}$ to $\frac{1}{2}$ point to port bow; first I thought it was the Molokai light; it changed its bearing. I watched it for five minutes. At this time the quarter master wished to be relieved. I went to call Antone to take the wheel; it took a couple of minutes or so. When I got on the bridge again, the light was still moving starboard; at this time there were two lights, two bright lights close to each other. I could not tell very well whether they were high or low. They seemed quite a distance off."

"I then went down to find the captain, but could not find him." He then returned to the deck, and blew one whistle to call the captain's attention. He came on deck pretty soon, when the mate testified "I showed him the light."

"He said the light was too far away to see any side-lights. The mate came on deck. He stepped forward to the scuttle, and said 'there is a green light, what are you doing on this side of her' "?

"An order was given to hard port when we struck her. I think it was a minute or it might have been a little longer before the collision, after the whistle blew. If it was a minute, the ship went 1000 feet. I got excited when I went to call the other quarter master. There was no one else to send, so I went myself. The collision took place about a quarter to nine."

"I may have seen a green light and likely I did."

Q.   "When you were on the bridge, as a lookout, there was nobody there except Fischer and yourself?

A.   No.

Q.   Only you two?

A.   Yes.

Q.   And while there you first went after the quarter master?

A.   Yes.

Q.   And after a while you went after the captain?

A.   Yes.

Q.   At any rate you only saw white lights?

A.   Yes.

Q.   You lost those and did not see anything?

A.   When?

Q.   Just before the collision?

A.   I was not looking for them; maybe I saw the green lights, but I could not say.   After the collision the green light I saw was burning brightly.

Q.   You should not have left your station?

A.   It would have been more ship-shape if I had stayed. There are only two quarter masters on all of these boats and it seems to be about the way it is done.

Q.   At any rate, yourself was the only lookout there was?

A.   Yes.

Q.   And during that time you went below twice?

A.   Yes.

Q.   Leaving the vessel entirely in charge of the man at the wheel?

A.   Yes.

Q.   You had charge of the vessel and did not know where that other boat was going, or how it was going, or whether it was a steamer or a sailing vessel.   Why didn't you slow up or stop?

A.   I naturally supposed she was going the other way.

Q.   At any rate there was no effort made upon the part of the steamer to stop her or slow down?

A.   No.

Q.   When the mate called out there is a green light, there was no chance of stopping the "Claudine?"

A.   I don't know.   She might have slowed down a little.

Q.   But no such order was given?

A.   No.

Q.   Didn't she have a chance to slow up or reverse her engines?

A.   I guess she could have done it.

Q.   And that was not done?

A.   No.

Q.   On the contrary, the captain gave orders to port the helm?

A.   To starboard the helm."

While Captain Weisbarth of the "Claudine," testified that he thought it was possible to have stopped the vessel between the period of time when the "Claudine" blew her whistles, and the collision.

When the mate of the "Claudine" saw the green light of the "Carson," Captain Weisbarth must have known that he was crossing the bow of a ship in motion, which is in direct violation of law (*The Excelsior*, 102 Fed. Rep. 652.)   The fact seems evident that the captain and the second mate of the "Claudine" were both confused; neither knew what he was doing or apparently just what to do under the circumstances.

But if it were true that the green light on the starboard side of the ship "Carson" could not be seen by the "Claudine" dead ahead, that could not afford a defense to the action.   First because the "Claudine" was at no time on the night of the collision dead ahead of the "Carson;" and second it is in evidence that the "Claudine" did see the light of the "Carson" long before the collision.   The evidence seems clear to the Court that the "Carson" was sailing on a south-west course when the "Claudine" sighted her and that she continued on that course as was her duty under the regulations; that her lights were the regulation lights and shining brightly, and the "Claudine" should, after sighting the lights of the "Carson," either have changed her

course to keep out of her way, slowed down or reversed her engines if in doubt. Either course would have avoided the collision. In fact the Court is satisfied the second mate, McNeil, of the "Claudine," saw the green light of the "Carson" all the time, but did not know what to do. He practically admitted it when he said, "I may have seen a green light."

The rule giving the sailing vessel the right of way requires the steamer to keep off her course if it be practically possible to do so. *The Marguerite*, 87 Fed. Rep. 953; *The Gate City*, 90 Fed. Rep. 314.

"In the case of a collision between a steam and a sail vessel, where it is shown that the latter kept her course, the presumption rises that the collision resulted from a failure of the steam vessel to keep out of the way." *Squires v. Parker*, 101 Fed. Rep. 843.

"Every steamship when approaching another ship so as to involve risk of collision shall slacken her speed, or stop or reverse if necessary." *Johnson v. Mayor of N. Y.*, 40 Fed. Rep. 601.

"This rule does not mean that she may wait until the danger is imminent before she slackens her speed nor that she need not slacken her speed if the risk of collision is caused by the fault of the approaching vessel; it is imperative. When risk of collision appears, it is the absolute duty of the steamer to slacken speed and not to trust to avoiding it by other means." *The Huntsville*, 8 Blatchford, U. S. 228.

When McNeil, the second officer of the "Claudine" saw the light about which he testified, instead of giving orders to do any of these things, or to take any measures or precautions which were necessary to avoid a collision, he left his post of duty twice, ran down stairs first to find the other quartermaster, and second to find the captain, remaining two minutes in the first instance, as testified to by him, and a minute on the second occasion. As was said by the Supreme Court of the United States in the case of *The Carroll*, 8 Wallace, U. S. 302.

"Nautical rules require that where a steamship and sailing vessel are approaching from opposite directions, on intersecting

lines, the steamship from the moment the sailing vessel is seen, shall watch with the highest diligence her course and movements, so as to be able to adopt such timely measures or precautions as will necessarily prevent the two boats coming in contact."

It is evident the second officer, McNeil, of the "Claudine" was either ignorant of his duty in this respect or deliberately ignored it.

No lookout was kept on the "Claudine." This was unpardonable negligence for which there can be no excuse; and by reason of which omission to keep the proper lookout aside from other reasons, the "Claudine" and its owners, under the circumstances of this case, must be held responsible for the collision. There is not the slightest conflict of testimony on this point. But two men were on the deck of the "Claudine" on that night from the time the light was first sighted until a moment before the collision, and those two were the man at the wheel, whose attention could not be directed from his duty, and McNeil, the second mate on the bridge, who was acting as officer of the deck in command of the ship and was in no sense a lookout, and who twice unwarrantably left his post of duty.

The testimony of Captain Merry, an old and experienced officer, who had been in the marine merchant service before entering the Navy, was to the effect that, "there could be no imaginable reason   *   *   *   that would warrant the officer of the deck leaving his post."

It is provided by Rule 29 of the Regulations for preventing collisions at sea, approved August 19, 1890, (Vol. 26 Stats. U. S. Pages 320 et seq.) and by Article 24 of the Sailing Regulations (Penal Laws of Hawaii), 1897, Page 540, that,

"Nothing in these rules shall exonerate any vessel or the owner or master or crew thereof from the consequences of any neglect to............keep a proper lookout, or by the neglect of any precaution which may be required by the ordinary practice of seamen or by the especial circumstances of the case."

All vessels should have a competent lookout stationed in such a position that he can descry approaching vessels at the earliest possible moment, and the want of an adequate lookout on board a vessel, at sea, is culpable neglect on her part which will *prima facie* render her responsible for injuries received from her in that condition, *Genesee Chief et al., v. Fitzhugh*, 12 How. (U. S.,) 443, 463; the *Catherine*, 17 How.,(U. S.) 170; *Chamberlain v. Ward*, 21 How. (U. S.) 548; *Heney v. Packet Co.* 23 How. (U. S.) 287; the *Leonard Richards*, 38 Fed. Rep. 767; the *Excelsior* 102 Fed. Rep. 652; *Greene et al. v. Campagnia Generale Italiana di Navigazione*, 102 Fed. Rep. 650; the *William Churchill*, 103 Fed. Rep. 690; the *Belgenland*, 114 U. S. 355.

The protection of sailing vessels on the high seas is a commercial necessity. Steam has become the great power on land and sea, but sea going steam freight and passenger vessels are of comparatively modern construction; and so the rules of navigation have but recently been made to meet these new conditions. One of the first international navigation rules made on these lines was that steam vessels must give the right of way to sailing vessels; not that the duty did not rest on both classes of vessels to avoid collision, but rather because steam vessels were more under the control of their navigators. They can stop, slow down, back or change their course in a short time and at will.

It is in proof in this case that the officers of the "Claudine" saw the lights of the "Carson" at 8:15 p. m., but she continued on her course right towards the "Carson" until 8:40 or 8:45 p. m., when the collision occurred. There is nothing to show that the "Claudine" ever stopped, backed, slowed down or changed her course until it was too late. The bare statement of these facts shows the steamer to have been in fault. The action of the officers of the "Claudine" cannot by any possible change of front or counter charge against the "Carson", avoid or limit the responsibility of the steamer and its owners.

It is uncontradicted that it was a full minute after the sounding of the steamer's whistle on the "Claudine", before she struck the "Carson"; that the "Claudine" sailed over 1000 feet a

minute; that she could have stopped within five hundred feet but did not do so. Even the Captain of the "Claudine" testified as hereinbefore referred to, that he "thought it was possible to stop between the sounding of the whistle and the collision." What was possible to have been done to avoid a collision should have been done, and throws upon the vessel responsible for the omission the liability for the damage resulting from the collision.

The Statute laws of the Republic of Hawaii on the subject of navigation are as severe as those of the United States, and the decisions of the Supreme Court of Hawaii are marked by a broad and enlightened advance step on this subject.

See the case of *Pacific Navigation Co. v. Allen*, 7 Hawaiian Rep. 12, and *Hind et al. v. Wilder Steamship Co.* 108 Fed. 113, where the Court especially defended "the weaklings of the sea", the sailing vessels, from being run down either by the carelessness or mistakes of steam vessels, and maintained the navigation laws in all their strictness.

The fact that there was no regular lookout on the "Claudine", and the extraordinary behavior of the second mate in leaving the deck twice, while acting as the officer thereof, and when an unknown light was approaching, seem to be in keeping with the utter lack of discipline on the steamer. This was particularly noticeable, when after the collision the second mate, McNeil, was ordered to lower a boat to save the people on the "Carson", he testified: "I went to hunt up the natives: they were here, there and everywhere, but after a while we got men enough together to man a boat."

Such an utter lack of discipline on a sea-going steamer carrying passengers, can have no excuse, and is susceptible of no apology. What if both vessels had been injured (which was a most possible thing) and both in a sinking condition, and no time was given to "hunt up" the sailors of the "Claudine"?

"Owners of vessels and especially those who own and employ steamships, whether propellers or side wheel steamers, must see to it that the master and other officers intrusted with their control and management are skilful and competent to discharge their

duties, as in case of a disaster like the present, both the owners and the vessel are responsible for their acts, and must answer for the consequences of their want of skill and negligence; and this remark is just as applicable to the under officers, whether the mate or second mate, as to the Master, during all the time they have charge of the deck." *Chamberlain v. Ward*, 21 How. (U. S.) 548, 564-5.

In conclusion the Court holds that the "William Carson" was sailing a southwest course, at the time of the collision, and all the time showed her starboard side to the "Claudine;" that her lights were properly constructed and placed and were not obscured so as to be invisible to the "Claudine", but that the same were brightly burning on the night of the collision, and were visible from a point dead ahead to two points abaft the beam for a distance of two miles; that the "Claudine" did not have a lookout on the night of the collision, which fact contributed to the accident; that the second mate, while acting as officer of the deck of the "Claudine" on the night of the collision, after descrying the moving lights of the "William Carson", against all precedent twice left his post of duty and went below; that the "Claudine" did not slow down, stop or reverse or change her course in time to avoid the collision, when she could have done so; that the "Claudine" attempted to cross the bow of the "William Carson" when she was in motion and when such action would necessarily lead to a collision; that if the "Claudine" did not observe the green starboard light of the "William Carson", it was clearly the fault of the second mate acting as officer of the deck of the "Claudine"; that the "William Carson" did not contribute at all to the collision, but that the same was due to the negligence and unskilful navigation of the steamship "Claudine", for which the said steamship and her owners are liable.

Let a decree be entered in favor of J. S. Low, the libellant, for $9050 with interest and costs from the date of the collision; and in favor of John Piltz, libellant, for the sum of $1162.80,

the value of the articles proven to have been lost by him, together with interest from date of collision and costs.

Nothing is allowed the libellant in the case of *Piltz v. Wilder Steamship Co., et al.*, for the personal effects proven to have belonged to his wife, as it does not appear to the Court that he was authorized to sue for or maintain an action for the same.

NOTE: Affirmed on appeal, *Wilder Steamship Co., et al., v. Low, et al.*, 112 Fed. 161.