### THE ELSWICK TOWER.

(District Court, S. D. Georgia, E. D.   March 30, 1917.)

1. SEAMEN &7—SHIPPING ARTICLES—CONSTRUCTION OF STATUTE—FOREIGN VESSELS.
    Rev. St. § 4511 et seq. (Comp. St. 1916, § 8300 et seq.), which require seamen to be signed before a shipping commissioner, provide penalties for its violation, and that shipment of seamen in violation of any act of Congress shall be void, apply only to American vessels, and the signing of foreign seamen in a port of the United States before a British consul for service on a British vessel creates a valid contract.
    [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 19–24.]

2. SEAMEN &21—WAGES—FORFEITURE BY DESERTION.
    The refusal of seamen on a British ship to work further after the arrival of the vessel in a port of the United States, although their contract of service had not expired, *held* an act of desertion, by which they forfeited their right to wages.
    [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 92–110.]

In Admiralty. Suit by Francisco Antonio Rosales and others against the steamship Elswick Tower. Decree for respondent.

&For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Francisco Antonio Rosales, a Brazilian, Manuel Fonsoca and Emanuel Nichola, of the Cape Verde Islands, and Axel Magnusson, of Sweden, firemen stokers on the British steamship Elswick Tower, brought their libel in rem for an alleged nonpayment of wages. It is alleged that they entered the service of the ship in that capacity, and entered into a contract with Henry Byers, master. This was in the port of New York. The ship, it is alleged, was destined for Naples, thence to Huelva, Spain, and thence to the port of Savannah. She arrived at Naples and delivered her cargo, thence proceeded to Huelva, Spain, and, taking on a cargo, proceeded to Savannah, where she arrived about the 3d day of February, 1917, when the wages became due and payable. These the master refused to pay. James Brown, who alleges himself to be a citizen of the United States, shipped also as fireman stoker at Huelva, Spain. He adopts the allegation of the libel and sues for his wages.

The answer admits the employment of the libelants, but denies that the voyage was destined for Naples, thence to Huelva, and thence to Savannah; on the contrary, that the master did not know of the destination of the ship until he arrived at Gibraltar. This was true, also, on the return voyage. It denies that the voyage for which the libelants were indentured was ended at Savannah, and that the wages had become due and payable. It avers that the shipping articles signed by the libelants, save in the case of James Brown, were for two years from September 21, 1916, and therefore that libelants were not entitled to demand payment of all their wages until the end of the two-year period. Admitting the nonpayment of the wages, the answer avers that on arrival in Savannah libelants declined to perform any further service; that James Brown had signed the regular articles of agreement for the term of two years remaining after the date of his shipment. It is provided that he might be discharged at any port in the United States, at the master's option, and that the port selected by the master was Newport News. The answer points out that, since the libelants have placed themselves in the attitude of deserters, they are not entitled to payment, but, if held so entitled, the balance is not as they state, but should be calculated in accordance with an account set forth in the answer; further that, as respondents believe that the libelants will desert the ship in Savannah, he will be required to employ others at a greater expense to perform their duties.

The foreign seamen signed the articles of agreement in the office of the British consul, and before that official, in New York. While the ship was lying at Huelva, Brown, who reached it too late to go before the American consul, signed before the chief officer of the vessel. It appeared that the shipping articles exhibited the letters "O. H. M. S.," importing "On His Majesty's Service," and it is claimed for the respondents that she was actually in the service of the British government. The agreement contains the following material stipulation: "The several persons whose names are hereto subscribed, and whose descriptions are contained herein, and of whom seven are engaged as sailors, hereby agree to serve on board the said ship, in the several capacities expressed against their respective names, on a voyage from ———— of not exceeding two years' duration to any ports or places within the limits of 75 degrees north and 60 degrees south latitude, commencing at Liverpool, proceeding thence to O. H. M. S., and/or any other ports within the above limits, trading in any rotation, and to end at such port in the United Kingdom or continent of Europe (within home trade limits) as may be required by the master." From the evidence of the master, Byers, and the chief officer, Dowell, it appears that the articles of agreement, in which the provision just quoted appears, was read over and explained to Jim Brown at Huelva, and that it was understood that Brown was to be paid off at any port within the United States, at the master's option, and that the master designated Newport News as the port. To the contrary, Brown testifies that it was agreed verbally, at the time he signed the articles of agreement, that he should be paid off at Savannah.

Oliver & Oliver, of Savannah, Ga., for libelants.

Anderson, Cann, Cann & Walsh, of Savannah, Ga., and J. P. K. Bryan, of Charleston, S. C., for respondents and claimants.

SPEER, District Judge (after stating the facts as above). [1] If the shipping articles, or, as they are termed, "agreement and account of crew," are to be regarded as binding, the conduct of the libelants in Savannah presents a violation of such articles. They are in that event to be regarded and treated as deserters, and not entitled to redress for their alleged grievances. It is, however, insisted for them that the shipping articles are void. It is contended that the fact that they were signed before the British consul in the city of New York by the foreign seamen, and by James Brown at Huelva, Spain, before the chief officer of the steamer, and not before the British or American consul, destroys their validity. As to the. New York signing, the libelants rely on United States Compiled Statutes of 1901, volume 3, section 4511. This provides:

"The master of every vessel bound from a port in the United States to any foreign port, other than vessels engaged in trade between the United States and the British North American possessions, or the West India Islands, or the republic of Mexico, or of any vessel of the burden of seventy-five tons or upward, bound from a port on the Atlantic to a port on the Pacific, or vice versa, shall, before he proceeds on such voyage, make an agreement, in writing or in print, with every seaman whom he carries to sea as one of the crew, in the matter hereinafter mentioned," etc.

Thereafter section 4512 provides:

"Every agreement, except such as are otherwise specially provided for, shall be signed by each seaman in the presence of a shipping commissioner."

A penalty of $200 for any person who is carried to sea as one of the crew without entering into the agreement provided for with the master of such vessel is affixed by section 4514; and section 4515 attaches the same penalty to the vessel if any officer knowingly receives or accepts any seaman who has been engaged or supplied contrary to such provisions. Section 4523 provides that all shipments of seamen made contrary to the provisions of any act of Congress shall be void, and such seamen shall be entitled to recover the highest rate of wages from the port from which the seaman was shipped, or the sum agreed to be given him at his shipment.

The duties of the commissioner are very clearly defined in the opinion of Mr. Justice Clifford in United States v. Grace Lothrop, 95 U. S. 530, 24 L. Ed. 514. There was a case where the seamen were engaged by an agreement in writing not signed in the presence of the shipping commissioner. The government failed, because the voyage was to the West Indies, one especially excepted from the operation of the statute. In United States v. Smith, in 95 U. S. 536, 24 L. Ed. 514, the information to recover the penalty failed of its purpose because the voyage was coastwise between Atlantic ports, also excepted, and because all that was charged against the defendant was that he had engaged the seamen, which any one may lawfully do, provided he subsequently signs before the shipping commissioner. The Case of William H. Clifford (D. C.) 165 Fed. 59, cited by the proctors for the libelants, was an action in rem to recover wages as seamen. Not only was the voyage held to be excepted, but because the seamen refused to assist in discharging the cargo in an emergency, and left the ship, it was held to be desertion, which forfeited their right to wages.

From these authorities, and others which might be cited, it seems evident that this legislation, designed for the amelioration of the condition of American seamen and the advancement of American maritime commerce, providing as it does for the avoidance of shipping articles and for penalties for its neglect, must be strictly construed. Whether it applies to foreign ships and foreign seamen in American ports, as is here in issue, seems fairly debatable.

It is contended for the respondents that the fifty-third title of the Revised Statutes, which includes the sections quoted supra, applies only to American ships and American seamen, and that this contention extends to section 4523, making void the shipment of seamen contrary to any act of Congress. This seems upheld by the amendment of section 4612 by Act Dec. 21, 1898, chapter 28, par. 23 (section 8392 of the United States Compiled Statutes, West Publishing Company). This affords a statutory construction of grave importance as follows:

"In the construction of this title, every person having the command of any vessel belonging to any citizen of the United States shall be deemed to be the 'master' thereof; and every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a 'seaman'; and the term 'vessel' shall be understood to comprehend every description of vessel navigating on any sea or channel, lake or river, to which the provisions of this title may be applicable, and the term 'owner' shall be taken and understood to comprehend all the several persons, if more than one, to whom the vessel shall belong."

In the case of the Montapedia (D. C.) 14 Fed. 427, the complaint was that there was no superintendence of the agreement of shipment by a shipping commissioner. District Judge Billings held that the statute requiring this related exclusively to a ship belonging to a citizen of the United States. In United States v. Minges, 16 Fed. 657, Circuit Judge Bond held that the provisions of the statute there in question must be construed in connection with the definition afforded by section 4612, supra, and did not relate to a foreign vessel. Both of these eminent judges were widely known for their predilection for enforcement of national laws in a national sense. See, also, Grant v. United States, 58 Fed. 694, 7 C. C. A. 436. These two last cases are indictments for harboring seamen deserting from foreign vessels. See, also, United States v. Kellum (C. C.) 7 Fed. 843. There was an attempted enforcement of a penalty for receiving greater remuneration than authorized by law for securing employment for seamen. It is true that the Supreme Court of the United States (In re The Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002) enforces against a foreign vessel the penalty of the act of December 21, 1898. This made it a misdemeanor to pay wages in advance.

It is not, however, apparent that this holding minifies the interpretative effect of section 4612 of the Revised Statutes, which, as we have seen, gives the statutory construction to the title, and defines the master, seamen, and vessel which are affected by the several provisions. The section which the Supreme Court had under consideration, while making it a misdemeanor to pay wages of seamen in advance, also especially provided that it should apply as well to foreign vessels as to vessels of the United States. This seems the only provision of the legislation to ameliorate the condition of seamen which has such

distinct application to foreign vessels. In the absence of the use of such language generally, and its expression here, by application of the familiar maxim of construction, "Expressio unius exclusio alterius est," even had section 4516 not been enacted, it would seem to make other provisions of the statute inoperative as to foreign owned vessels and foreign seamen. Indeed, the act authorizing the appointment of shipping commissioners by the several Circuit Courts of the United States, in its title outlined the duties of such officials "to superintend the shipping and discharge of seamen engaged in merchant ships belonging to the United States, and for the further protection of seamen." It is true, as held in the Eudora Case, supra, that the title of an act cannot control plain words in the body of the statute; but to use the language of Chief Justice Marshall in United States v. Fisher, 2 Cranch, 358, 386, 2 L. Ed. 304:

"Where the mind labors to discover the design of the Legislature, it seizes everything from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration."

In the Eudora Case, the sole question passed upon was the illegality of the advance payment of wages. It is true that Mr. Associate Justice Brewer, in his opinion arguendo, by the use of the word "provisions," seems to impart a wider significance; but the context (190 U. S. on page 178, 23 Sup. Ct. 821, 47 L. Ed. 1002) indicates that he refers only to the penalty provisions of section 10 of chapter 121 of the Act of 1884 (23 Stat. 55; Comp. St. 1916, § 8323), as amended by the act of December 21, 1898, which was the mischief of which Congress was affording the remedy. Besides, after adverting to the wrongs done to sailors, the learned justice (190 U. S. on page 175, 23 Sup. Ct. 823, 47 L. Ed. 1002), uses this language:

"One of the most common means of doing these wrongs is the advancement of wages. Bad men lure them into haunts of vice, advance a little money to continue their dissipation, and, having thus acquired a partial control and by liquor dulled their faculties, place them on board the vessel just ready to sail, and most ready to return the advances. When once on shipboard and the ship at sea, the sailor is powerless, and no relief is available. It was in order to stop this evil, to protect the sailor, and not to restrict him of his liberty, that this statute was passed. And while in some cases it may operate harshly, no one can doubt that the best interests of seamen as a class are preserved by such legislation."

The court, then considering the protection of seamen as a class, and having before it a provision of the law expressly extended to foreign vessels, did not hesitate to make it operative and effective.

[2] The contract in this case was strictly in accordance with the rules of the British Board of Trade, and the law of the flag applies where a foreign crew is shipped in a foreign land on a foreign vessel. Said the Court of Appeals of the Ninth Circuit in Rainey v. New York & P. S. S. Co., Limited, et al., 216 Fed. 454, 132 C. C. A. 514, L. R. A. 1916A, 1149:

"When Rainey, although a citizen of the state of Washington, went before the British consul at Seattle and signed the shipping articles, and thereupon stepped upon the British ship, flying the British flag, as a member of its crew, as the record shows he did, he stepped upon British territory and became entitled to the protection and benefit of all British law in behalf of British seamen, and subject to all of its obligations and liabilities."

Grave considerations depend upon the question whether or not the Elswick Tower is to be treated as a public ship. Certain it is that the articles of agreement indicate that she was on his majesty's service. Unless constrained otherwise, the admiralty courts of the United States would be reluctant to uphold the abandonment of duty by so many of the crew of a ship in the service of the government of a friendly power, particularly when such power is exerting its utmost energies in war, in which the very existence of its institutions is threatened. Besides, these seamen were receiving a large bonus for their services because of that war, and on the whole we are convinced that their refusal to continue to work under the circumstances was not only violative of a shipping agreement valid as to all, but makes them guilty both of mutiny and desertion.

The case of James Brown is a little different. It is true that he claims to be an American citizen, but with a full understanding of the articles he signed them at Huelva, in Spain. The evidence shows that he fully understood that he was to be discharged in a port in the United States, at the option of the master. In the exercise of this option, the master selected Newport News. Brown claimed his discharge at Savannah. It was not accorded him, and his refusal thereafter to work places him in the category of the others.

The libel is dismissed, with costs.