### CORRIGAN et al. v. UNITED STATES.

(District Court, S. D. New York. August 15, 1923.)

1. **Seamen ⬅⟹24—Refusal or neglect to pay wages must have been without reasonable cause.**

Under Rev. St. § 4529 (Comp. St. § 8320), providing double pay to seamen during time payment is delayed beyond specified periods "without sufficient cause," the refusal or neglect to pay must be without reasonable cause.

2. **Seamen ⬅⟹24—Not entitled to double wages during delay in voyage at intermediate port.**

Under Rev. St. § 4529 (Comp. St. § 8320), seamen were not entitled to double wages during the ship's delay at an intermediate port for repairs though thereby the term of the voyage exceeded that specified in shipping articles, if owner was without fault and seamen were paid off when discharged.

3. **Seamen ⬅⟹7—Master required merely to make honest and intelligent effort to keep voyage within time specified.**

Shipping articles specifying duration of voyage merely requires the master to make an honest and intelligent effort to keep the voyage within specified time, and the seamen take the risk of contingencies prolonging the voyage.

4. **Statutes ⬅⟹241(1)—Penal statutes strictly construed.**

Penal statutes are strictly construed.

5. **United States ⬅⟹77—Government liable for penalty only when statute expressly so provides.**

The government can be held liable for a penalty only when the statute fixing the penalty expressly so provides.

In Admiralty. Libel by William J. Corrigan and others against the United States. Libel dismissed.

Silas B. Axtell, of New York City, for Libelant.

William Hayward, U. S. Atty., of New York City (Burlingham, Veeder, Masten & Fearey, of New York City, of counsel), for the United States.

GODDARD, District Judge. In Admiralty. This is a suit by 22 seamen to recover a total of $7,273.50, which they claim as waiting time from February 21, 1920, to June 19, 1920, a period of 3 months

and 27 days, under section 4529 of the United States Revised Statutes (Comp. St. § 8320).

### Facts.

The libelants signed shipping articles at Philadelphia August 22, 1919, for a voyage of the Steamship Nedmac to "So. America and such other ports and places in any part of the world as the master may direct, and back to a final port of discharge in the United States north of Cape Hatteras for a term of time not exceeding 6 calendar months." The S. S. Nedmac had just been completed, and this was her maiden voyage. She passed her trial trip tests, and at the time of sailing, August 23, 1919, she was classed Lloyd's A–1. She carried a general cargo for Rio de Janeiro, Santos, and Montevideo, and was in charge of a master who had held a master's license for 20 years, and who, during the recent World War, held a commission as lieutenant commander in the United States Navy.

Her voyage down was uneventful until September 23, when, during a fog, she struck a reef off Cape Santa Maria on the Uruguayan coast. Two days later she was pulled off the reef by a Uruguayan government tug. The ship's grounding was investigated by the United States local inspectors, who exonerated the master of all blame. As a result of examination by divers, it was found that the plates under No. 2 hold were torn and the bilge keel badly ripped. On October 6th she sailed, and arrived at Buenos Aires the following day. On her arrival at Buenos Aires another diver examined her, and it was decided to put her in dry dock, and on October 24th she entered a government dry dock, and an official survey was held by three masters and representatives of Lloyd's and of the American Bureau. Plates were found to be dented practically her whole length, and two plates under No. 2 hold were broken. As permission could not be obtained from the Argentine government to allow her to remain in dry dock for any length of time, patches were put on the two broken plates. She left the dry dock November 1st, but owing to her condition neither Lloyd's nor the American Bureau would allow her to sail, and specifications were drawn up for provisional repairs which necessitated dry-docking again, and would take 40 to 45 days to complete. On November 4th all the shipyard employees at Buenos Aires went on a strike. After it had continued for some time Lloyd's agent made another survey, and on January 20th got out specifications for repairs that would not require drydocking. Although requested by the master, the American consul and the ship's agents declined to employ nonunion labor for fear that this would cause all the Shipping Board ships in the harbor to be boycotted by the unions, and that even the stevedores might quit. Attempts were then made by the master to have the ship repaired at Montevideo, but was unsuccessful in this.

On February 2, 1920, exactly 6 months from the date of shipping articles, a committee of five of the crew called on the American consul and asked to be discharged on the ground that the voyage had been continued contrary to the articles. The vice consul, after granting the men a hearing and investigating the cause of the delay, found that the voyage had not been unnecessarily prolonged in violation of the articles, and accordingly he denied their request for discharge, and also made

an official report of the matter to the Secretary of State. In this report he stated that he was satisfied that the ship's agents were using their best efforts to have repairs made as promptly as possible. On March 16th Lloyd's agent made another survey for the minimum temporary repairs (without dry-docking) required for a certificate of seaworthiness, so that the ship could return home "on her tank tops." These repairs could not be made without the use of shore labor, and as the strike continued the work could not be done.

Representatives of the American Bureau of Shipping were then asked to modify Lloyd's specifications so that the repairs could be made without any assistance from ashore. The master then asked the crew if they were willing to undertake the work, which they agreed to for an extra compensation. On March 13th the deck officers and crew signed a written agreement whereby they undertook to make the repairs necessary to allow the ship to return to the United States, providing that no laborers from ashore interfered with their work. On March 19th the entire crew signed the following agreement:

"This is to certify that we, the undersigned, officers and crew of the S. S. Nedmac, on being requested by the master of the said S. S. Nedmac agree to undertake necessary repairs to the tank tops of the said S. S. Nedmac, and take the said S. S. Nedmac back to the United States of America on these repaired tank tops, whether or not a certificate of seaworthiness can be obtained for the S. S. Nedmac."

The extra compensation paid was 80 cents an hour to officers and 60 cents an hour to the men, and time and one-half for work over 8 hours a day; this compensation in addition to their regular pay under the shipping articles. The repairs were completed in about 20 working days. However, they were not in accordance with Lloyd's specifications, and consequently Lloyd's refused to grant a certificate of seaworthiness, and gave notice that her classification would be canceled.

The ship sailed from Buenos Aires in May and arrived in Philadelphia in June; the crew was discharged and paid off June 19th.

Section 4529, under which libelants seek to recover, is as follows:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage."

In The Express (D. C.) 129 Fed. 655, the court, referring to this statute, said:

"The statute is a penal statute, intended to punish masters of vessels who, without any just excuse, arbitrarily refuse to pay seamen their wages when due."

[1] There can be no recovery unless the refusal or neglect was "without sufficient cause," or as was held in George W. Wells (D. C.) 118 Fed. 761, "without reasonable cause." That the remedy under section 4529 is a matter of penal law, and not of contract, is shown in The City of Montgomery (D. C.) 210 Fed. 673.

[2] The delay for which the libelants are seeking to recover occurred not at Philadelphia, where the voyage ended, but at Buneos Aires, an intermediate port. Their wages continued until they were paid off and discharged at Philadelphia, and their claim for waiting time under section 4529 covers the period from February 21, 1920 to June 19, 1920, the date they signed clear of the vessel at Philadelphia. Under these circumstances it is difficult to see how they are entitled to relief under a statute which requires payment of wages "within 24 hours after the cargo has been discharged, or within 4 days after the seaman has been discharged, whichever first happens."

In The Cubadist, 256 Fed. 203, 167 C. C. A. 419, certiorari denied Gordon v. The Cubadist, 249 U. S. 618, 39 Sup. Ct. 392, 63 L. Ed. 804, it was held that the words "within 24 hours after the cargo has been discharged" refer to discharge on completion of the voyage for which the seamen shipped. The court said:

"It is clear from this reference to section 4529 that Congress intended that section to cover only the payment of full wages due, on the completion of the voyage or discharge of the seaman, and section 4930 to cover all payments to be made during the progress of the voyage."

[3] It is true that the shipping articles described the voyage and stated its duration to be "for a term of time not exceeding six calendar months;" but navigation is attended with so many unforseen perils and difficulties in port that the legal effect of such a provision is that the master must make an honest and intelligent effort to complete the voyage within that time, and the seamen take the risk of contingencies which without fault of vessel or master prolong the voyage. The Belvedere (D. C.) 100 Fed. 498, affirmed 108 Fed. 299, 47 C. C. A. 338. See, also, Hamilton et al. v. U. S., 268 Fed. 15 (C. C. A. 4th Circuit), certiorari denied 254 U. S. 645, 41 Sup. Ct. 15, 65 L. Ed. 454.

I think it clearly appears that the delay was not due to the fault of the master or the vessel. Moreover, in the articles was a provision to the effect that any dispute relative to wages should be submitted to a United States shipping consul or commissioner, and that any decision rendered by him should be binding on both parties.

[4, 5] However, had the libelants shown that the voyage ended before it reached Philadelphia, and that there was undue delay in paying off the crew, I doubt if there could be any recovery under section 4529. The penal statutes, of course, are strictly construed, and the government can be held liable for a penalty only when the statute fixing the penalty expressly so provides.

In Missouri Pacific R. R. Co. and Director General of Railroads v. Ault, 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed. 1087, the court said:

"But double damages, penalties and forfeitures, which do not merely compensate but punish, are not within the purview of the statute. * * * Whatever name be applied, the element of punishment clearly predominates

and Congress has not given its consent that suits of this character be brought against the United States. The judgment against the Director General, so far as it provided for recovery of the penalty, was erroneous."

Neither the suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*) nor the Shipping Act of 1916 (Comp. St. §§ 8146a–8146r) contains any provisions whereby the United States is made liable for penalties.

Libel dismissed. Enter decree accordingly.