### SHANLEY et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. November 5, 1923.)

No. 64.

1. **Seamen ☞6—Agreement by master to pay double wages, made under duress, held ineffective.**

Where seamen signed for a voyage, not exceeding six calendar months, and the time expired before completion of the voyage, and when the vessel was in a foreign port, where there was no American consul, and on refusal of the crew to serve longer, except for double pay, the master signed an agreement for double wages for the remainder of the voyage under protest, such agreement was ineffective, and the rights of the parties are determined under the original contract.

2. **Seamen ☞7—Should complete voyage, unless delay is due to fault of vessel, master, or owner.**

Where delay which extends the period mentioned in the shipping articles is not due to any fault of the vessel, master, or owner, it is the duty of the seaman to continue his service until completion of the voyage to the port of destination.

3. **Seamen ☞17—Settlement of dispute as to wages properly deferred until end of voyage.**

Where, at the time the term of service of seamen expired, the vessel was in a foreign port, where no consul was available, and no demand was made by the crew to go to a consul port to settle a wage dispute, the master properly proceeded to the port of destination.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by Joseph F. Shanley and others against the United States. Decree for libelants, and respondent appeals. Reversed.

For opinion below, see 274 Fed. 691.

Burlingham, Veeder, Masten & Fearey, of New York City (William J. Dean and Roscoe H. Hupper, both of New York City, of counsel), for the United States.

Frederick R. Graves, of New York City (Simon N. Gazan, of New York City, of counsel), for appellees.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge. Libelants and other members of the crew signed shipping articles on what was then known as form 705A. The date was August 28, 1919, the place, Philadelphia, Pa., and the amount of wages was agreed to and fully set forth in the articles. The articles read:

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"It is agreed between the master and seamen, or mariners, of the steamer Liberty Land, of which A. L. Cornewal is at present master, or whoever shall go for master, now bound from the port of Philadelphia, Pa., to Africa, via coastwise and such other ports and places in any part of the world, as the master may direct, and back to a final port of discharge in the United States, north of Cape Hatteras, for a term of time not exceeding six calendar months."

It was also agreed:

"That any dispute relative to wages, provisions, and fines between the master, any officer of vessel, and any member of the crew shall be submitted to a United States shipping commissioner, or consul, and that any decision rendered by him shall be binding upon both parties, and shall, in any legal proceeding which may be taken in the matter before any court of justice, be deemed conclusive of the rights of the parties as to such question or subject of dispute."

The controversy disclosed by the record may be briefly stated as follows: The six months expired on February 28, 1920. At that time the vessel was at Accra, West Africa. Libelants insisted that the voyage had ended, and the master made a new agreement, in the circumstances, infra, which involved the payment to the crew of double wages for the return voyage. The District Court found that this agreement was made under duress, but nevertheless awarded to libelants a certain amount of additional wages, upon the theory that, had the master proceeded to Gibraltar, where there was an American consul, the crew could have there extracted from the master the agreement which they obtained from him at Accra, and, to that extent, that the libelants were entitled to additional pay for such period of the voyage as would represent the time occupied between Gibraltar and New York, the port of discharge, if the vessel had gone to Gibraltar.

An examination of the record shows that the District Judge was fully justified in concluding that:

"The libelants, therefore, were not in a position to insist upon the making of the contract, which the captain entered into under duress and protest."

The Liberty Land loaded her cargo at New York. As this was to be her maiden voyage, she was subjected to a 12-hour deep load trial trip, during which her turbine gears were found to be slightly damaged. They were promptly repaired, and she underwent a second trial trip, during which she was found to be seaworthy in every respect. She sailed from New York on September 23, 1919, and reached the west coast of Africa on October 6, 1919. On November 13, 1919, her anchor got foul of the hawse pipe, and, through an error of one of the libelants, the anchor was heaved up, instead of being slacked away, and the sudden strain broke the main lifting wheel of the anchor windlass, with the result that a new lifting wheel was cast in the machine shops at Logos, where this accident happened, and this repair took six weeks.

On January 29, 1920, the main condenser started leaking, and the repairs to the damage resulting from this leak took from February 7th to February 21st. Upon the completion of these repairs, the vessel proceeded to Accra for cargo, and loaded on about 1,500 tons for the United States. Accra is an open and unsafe port and hence the vessel anchored about a mile and a half off shore. On the morning of February 28th, exactly six months from the date of the shipping articles,

the entire crew, except the officers, refused to continue, and demanded their wages and free transportation to the United States, on the ground that the articles had expired. There is testimony that there were no threats made, but that must be construed as meaning merely that violent or unpleasant language was not used. The conduct and demands of the crew were equivalent to a threat. It is sufficient to refer to the testimony of Lundstrom, one of the libelants, who stated:

"We wanted to get double pay, or else get paid off and sent home, or take the ship into a safe port; but the captain would not pay us the double pay."

He further testified that there was a meeting of the crew on the morning of February 28th, attended by most of their members, at which the men decided to demand double pay, and that this suggestion had been made by the whole crew. Logos was mentioned as a safe harbor. This was 24 hours' run from Accra, and the men said they would wait there until a relief crew could relieve them, and they demanded that then they should be sent back as passengers. It was not possible for the master to obtain a crew, and he thus found himself in a helpless situation. There was no American consul at Accra, and therefore the master sent for Mr. Johnston, the British supervisor of customs. He came aboard and advised libelants to return to work, but they refused, and demanded either to be paid off and sent home as passengers, or to be paid double wages to take the vessel back to the United States. In these circumstances, the master promised to pay the libelants double wages, and informed them that the matter would be settled by the United States shipping commissioner in the final port of discharge. To satisfy the men the master signed and delivered to them a memorandum, dated February 28, 1920, and witnessed by Johnston, wherein he stated:

"I hereby certify that the master of the steamship Liberty Land has agreed to pay the undermentioned seamen * * * double wages from date of expiry of agreement until the vessel arrives at a final port of discharge in the United States north of Cape Hatteras."

In his log, the master noted that this promise was granted "under protest," and we have no doubt of the truth of the entry thus made. The British official indorsed on the shipping articles the following:

"Custom House, Accra, 28th Feby., 1920.

"At the request of the master I have inquired into the grievances of the crew, and find that the seamen whose names appear on lines * * * have refused to continue the voyage in the ship, owing to the agreement having expired on the 28th inst., unless they receive double wages. After enquiry and perusal of agreement I recommend the master to grant their request, in order not to delay the ship, as no crews are available at this port. The crew have agreed to take the ship back to the United States at double wages as per agreement on articles from date of expiry of agreement. The crew agree to the articles being extended until the vessel arrives in United States at double wages. I further certify that no American consul resides at this port."

The vessel then sailed promptly for New York, where she arrived April 3, 1920, an overlap of about five weeks. On April 7th libelants were paid off at the original rate of wages and were discharged before the shipping commissioner. The shipping commissioner was not called as a witness, and apparently he did not examine the merits of the dispute, but merely told the men that the Shipping Board had refused

to grant their demands. We are not called upon, therefore, to consider the provisions of the articles as to the conclusiveness of his decision.

[1] As we find as a fact, as did the court below, that the so-called new contract between the master and the libelants was forced under duress, the legal result is that there was no new contract and in order to determine the rights of the parties we must turn to the original shipping articles. The delay occasioned to the vessel was not due to any fault of the master or the owner. The events which caused the delay were of a nature incident to navigation, over which, on the evidence in this case, neither the master nor the owner had control. One delay was due to the error of a seaman, and the other to an unexpected leaking in an article of the ship's machinery.

[2] The fundamental principle involved was considered in connection with an indictment under section 292 of the Penal Code (Comp. St. § 10465), in Hamilton v. United States (C. C. A.) 268 Fed. 15, certiorari denied 254 U. S. 645, 41 Sup. Ct. 15, 65 L. Ed. 454. In that case the shipping articles stipulated for a voyage, as in the case at bar, "for a term of time not exceeding six calendar months." The court, in recapitulating well-known rules, said (268 Fed. at page 17):

"(3) Seamen are bound to serve until the voyage ends in the port of destination, unless there has been a breach of the contract by the master as to the time of the voyage or in some other material particular."

This we think states the law of the case at bar clearly and succinctly. See, also, The Potomac, 72 Fed. 534, 19 C. C. A. 151, and Alaska Packers' Ass'n v. Domenico, 117 Fed. 99, 54 C. C. A. 485. Where the delay which extends the period mentioned in the shipping articles is not due to any fault of the vessel, or the owner, or the master, it is the duty of the seaman to continue his service until the vessel reaches the appropriate final port of discharge.

[3] If there had been an American consul at Accra and the dispute had been submitted to him, the result might or might not have been different. Where, however, as in the case at bar, an American consul was not available, except at a considerable distance, and where particularly no demand was made by the crew to submit the dispute to the consul, for instance, at Gibraltar, the master was justified in proceeding forward to his port of discharge as promptly as possible. Indeed, it was his duty to minimize the extra time to the best of his ability. This he did, and the result is that the contract embodied in the shipping articles remained unimpaired until the vessel reached New York, the final port of discharge.

The decree is reversed, without costs, and the District Court is directed to dismiss the libel, without costs.