**Aime BURIE et al., Libellants,**

v.

**OVERSEAS NAVIGATION CORP., Sirena Shipping Co., S.A., Panama, and the S.S. LOMALAND, her engines, boilers, tackle and appurtenances, etc., Respondents.**

United States District Court
S. D. New York.
May 24, 1962.

Lebovici & Safir, New York City, for libellants (Herbert Lebovici, New York City, of counsel).

Dougherty, Ryan, Mahoney & Pelligrino, New York City, for respondents (Lawrence J. Mahoney, New York City, of counsel).

COOPER, District Judge.

This is a suit by some twenty-one merchant seamen against the erstwhile owners of the SS LOMALAND, based, primarily, upon a claim of wrongful discharge and, alternatively, upon alleged violations of the statutory provisions governing shipment of seamen.

In essence the libel grows out of two principal alternative theories of recovery: (1) that respondents wrongfully discharged these seamen in violation of their original shipping articles; and (2) that for part of the voyage libellants were unlawfully taken to sea without written articles and hence may recover the statutory wages and penalties provided under 46 U.S.C.A. §§ 575, 578.

As developed at the trial the significant facts in this saga of the sea appear undisputed.

Respondent "Sirena" is concededly a Panamanian corporation which at the time in question was controlled by American stockholders. "Sirena" owned the SS LOMALAND, a ship duly registered under the law of Liberia and flying the Liberian flag. "Overseas," a New York corporation, acted as ship's agent for "Sirena" in connection with the operation of the vessel.

On August 18, 1956, the vessel's master opened shipping articles at New Orleans, Louisiana, providing for service aboard the

" * * * SS LOMALAND * * * now bound from the Port of New Orleans, La., Tampa, Fla., to Santos, Brazil via Trinidad, USA to Japan, via Panama, and West and East North America. And such other ports and places in any part of the world as the Master may direct, and back to a final port of discharge in the United States of America for a period of Eighteen Months (18 Months)."

Libellants are all aliens of diverse nationalities. Together with other seamen, four of them signed these Articles on August 18, 1956 at New Orleans; the remainder signed them on various subsequent dates at other ports in the United States and in other countries. (See Libellants' Exhibit 1).

Proceeding on her itinerary the LOMALAND arrived at Osaka, Japan, on January 13, 1958. The following day she commenced discharging cargo. On January 23, 1958, during the course of the vessel's call at Osaka, the respondent "Sirena" contracted for the future sale of the LOMALAND. After completing her discharge of cargo on January 28, the LOMALAND left Osaka on January 29, 1958, and sailed without cargo, in ballast, for Victoria, Vancouver, a port on the west coast of Canada, where she arrived on February 27, 1958.

It is manifest, therefore, (and the parties have so stipulated) that on the terminal date of the eighteen month period provided in the Articles, February 17, 1958, the SS LOMALAND was on the high seas en route from Osaka to the west coast of Canada.

During her stay at Victoria, the vessel spent approximately a week in drydock. She then took on a cargo of lumber at various places in and about the Vancouver area; and on March 30 she departed from Canada, bound for the Port of Providence (Rhode Island) and the Port of New York, on the last leg of her voyage.

While en route from Vancouver, the vessel stopped briefly at San Pedro, California, a bunkering port at which she only took on fuel, and then proceeded via the Panama Canal to the east coast of the United States. On April 29, 1958, a little less than two and a half months after the expiration of the eighteen month period s'ated in the Articles, the SS LOMALAND arrived at Providence, Rhode Island. She discharged part of her cargo at that port and then proceeded to New York City, where she arrived on May 4, and commenced discharging the remainder of her cargo. A few days

after such completion of the voyage, the crewmen were signed off.

In connection with this signing off, respondents made the necessary arrangements with the United States Immigration Service to cover the crew's alien status pending their repatriation home at the shipowner's expense or their securing employment here on board other ships. Respondents also paid each seaman (including libellants) his full additional wages for the period from February 18, 1958, until the date of his signing off.

At no time prior to the vessel's arrival at New York did any of the libellants, with the single exception of Raphael Garcia, request his discharge.

Upon termination of the voyage the SS LOMALAND entered a repair yard in the Port of New York; and on May 30, 1958, respondent "Sirena" formally transferred title to the vessel and turned her over to the new owner.

This chronology of events affords the factual foundation upon which libellants premise their two principal claims; the first is a cause of action for breach of contract and the second, alternative to the first, is a claim pursuant to the statutes of the United States.

With respect to the cause of action for breach of contract, libellants' basic contention is that their continued employment beyond the eighteen-month term stipulated in the Articles resulted, by implication of law, in a complete renewal of the Articles for another eighteen months. Thus, libellants argue that as to each of them the termination of employment at New York in May 1958 constituted a breach of a contract of employment impliedly renewed for the full period of its original duration.

Libellants in an ancillary claim for breach of contract also assert that in any event respondents violated the initial agreement by failure properly to discharge libellants at a "final port of discharge." Here, libellants contend that New York can in no sense be regarded as a "final port of discharge" and, in addition, that respondents failed in their duty to arrange for appropriate immigration documents, an essential requirement for the valid discharge of alien seamen in a United States port.

With respect to libellants' cause of action for wages and penalties under the United States statutes, the amended libel alleges in general that respondents violated those provisions which prohibit the shipment of seamen without written Articles (see 46 U.S.C.A. § 564), and that libellants therefore may avail themselves of the statutory remedies afforded under the terms of 46 U.S.C.A. §§ 575, 578. Specifically, libellants contend here that they were shipped from San Pedro and from Providence without written articles, and that under the statutory provisions they now retain the right to recover the highest rate of wages paid to seamen shipping from those ports for the period of libellants' actual service subsequent to such shipment (See 46 U.S.C.A. §§ 575, 578).

Upon the trial's conclusion libellants explicitly withdrew the third and fifth causes of action as alleged in their amended libel (see libellants' post-trial memorandum, pp. 54–55); hence, the Court need not now be concerned with those particular contentions. Moreover, with respect to the second cause of action stated in the libel, the Court finds that libellants' claim therein must be dismissed for lack of evidence. The remaining contentions, therefore, relate principally to (1) the claim for breach of contract based upon an alleged renewal of the Articles for another eighteen months, and (2) the alternative claim for penalties under the statutes covering shipment without Articles.

Respondents vigorously dispute the existence of any right to recovery under either of these remaining claims and contend that neither the asserted renewal of the Articles nor the claim for statutory penalties can in any way be sustained upon the facts appearing in this case. Thus, the issues emerge clearly drawn.

■ With respect to the threshold question of jurisdiction, it seems fairly

plain that jurisdiction to decide these issues exists by virtue of the constitutional and statutory grant of power to the federal courts in "all Cases of admiralty and maritime Jurisdiction." U. S. Const. Art. III. § 2; 28 U.S.C. § 1333. Nor do respondents anywhere challenge the court's jurisdiction in the case at bar. See Mason v. Ship Blaireau, 6 U.S. 240, 264 (1804).

■ Moreover, even if we view this case as essentially a controversy between foreigners or relating to foreign property, it is established beyond cavil that the retention of jurisdiction of such maritime suits is within the discretion of this court. See, The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152 (1885); Monteiro v. Sociedad Maritima San Nicolas, 280 F.2d 568 (2nd Cir., 1960), cert. denied, 364 U.S. 915, 81 S.Ct. 272, 5 L.Ed.2d 228 (1960); Kalyvakis v. The Olympia, 181 F.Supp. 32 (S.D.N.Y., 1960); Varvvovsos v. Pezas, 41 F.Supp. 318 (S.D.N.Y., 1941). Generally the court will exercise its discretionary jurisdiction of such suits unless there are special circumstances which indicate that justice could be better served by declining it. Kalyvakis v. The Olympia, supra. Here, libellants' remedy in some other forum is at best uncertain. Sufficient contacts with the United States exist, including libellants' discharge at a United States port; and the exercise of the discretionary jurisdiction of the district court in admiralty would, under the circumstances, appear entirely appropriate. The Falco, 20 F.2d 362, 363 (2nd Cir., 1927); Georqoussis v. Extramar Panama, 194 F.Supp. 181 (S.D.N.Y., 1960); but cf. McQuade v. Compania De Vapores San Antonio, 131 F.Supp. 365 (S.D.N.Y., 1955).

Before discussing the merits of the principal issues presented by this case, the court notes first that the respondent "Overseas" functioned through the period in question simply as a ship's agent for a disclosed principal, the owner of the SS LOMALAND.

■ "Overseas" was not a party to the Articles. The record unequivocally establishes that it had no relationship to the vessel or crew other than that of an agent for the owner. Its duties, in essence, were limited to those of a ship's husband, who has been engaged to take care of specific shoreside business for the ship, but who has no authority over the management of the vessel. Under these circumstances, "Overseas" may in no sense be deemed a party to the Articles; and consequently no relief can be granted against it. The libel as against respondent "Overseas" is accordingly hereby dismissed. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949); Instituto Cubano De Estabilizacion Del Azucar v. The Theotokos, 155 F.Supp. 945 (S.D.N.Y., 1957).

## I.

Although the libel nowhere either alleges or refers to a renewal of the articles, libellants contended upon the trial that the continuation of the vessel's voyage beyond the period of the original term necessarily resulted, by operation of law, in a renewal of the articles for a further period of eighteen months.

Upon the facts presented, however, the court concludes that libellants' assertion of an implied renewal plainly cannot be sustained.

■ Both sides, it may be noted, agree that the law applicable to determining this facet of the suit is Liberian law, the law of the flag of the vessel. See Lauritzen v. Larsen, 345 U.S. 571, 584, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); Rainey v. New York & P. S. S. Co., 216 F. 449 (9th Cir., 1914); cert. denied, 235 U.S. 704, 35 S.Ct. 209, 59 L.Ed. 433 (1914). It is recognized, however, that since Liberian law, in turn, expressly adopts the non-statutory general maritime law of the United States, and since no specific provision of any conflicting Liberian statute appears relevant, United States decisions elucidating general maritime law properly afford the basis for determination of this claim. See 22 Liberian Code § 30 (1956).

■ Under these decisions and upon the facts and circumstances of this case, libellants' assertion that the articles were renewed by operation of law for another period of eighteen months appears fundamentally inconsistent with acknowledged principles implicit in general maritime law. See, e. g., Corrigan v. United States, 298 F. 610 (S.D.N.Y., 1923); Uriarte v. United States, 14 F.2d 164 (E.D.N.Y., 1926); Norris, The Law of Seamen § 114.

It is undisputed that in the case at bar the voyage of the SS LOMALAND actually lasted some two and a half months longer than the eighteen months contemplated in the articles. Such a delay in completing the voyage might well be attributable to the ordinary vicissitudes and contingencies inherent in maritime trade. But in any event, it affords no tenable basis for a renewal of these articles by implication of law for another eighteen months.

As might be expected general maritime law has not altogether overlooked this possibility of expiration of the time mentioned in articles before actual completion of the voyage. It has long been recognized, for example, that where such time has expired and the voyage remains uncompleted, the crew may, in general, demand their discharge on that ground in any safe port and can go before an appropriate Consul and seek his aid in procuring it. See Shanley v. United States, 294 F. 502 (2nd Cir., 1923); Corrigan v. United States, supra, 298 F. at p. 611; Norris, op. cit., supra.

The maritime law carefully distinguishes, however, between delay which results through the fault of the vessel, or her owner, or the master, and such delay as may result simply from the inherent contingencies of maritime trade in spite of an honest effort on the part of the master to complete the voyage within the time indicated.

■ Thus, in Shanley v. United States, supra, the Second Circuit Court of Appeals stated (294 F. at p. 505):

"Where the delay which extends the period mentioned in the shipping articles is not due to any fault of the vessel, or the owner, or the master, it is the duty of the seaman to continue his service until the vessel reaches the appropriate final port of discharge."

See, also, Corrigan v. United States, supra, 298 F. at p. 613.

On the other hand, it is equally clear that where extension of the voyage beyond the time stated in the articles results from the fault of the owner or master, the seamen are entitled, upon demand, to be released and paid the wages earned by them up to that time. The Hotspur, 12 F.Cas. p. 562 (D.C.Oregon, 1874); Hamilton v. United States, 268 F. 15 (4th Cir., 1920), cert. denied, 254 U.S. 645, 41 S.Ct. 15, 65 L.Ed. 454 (1920).

Hence, in The Hotspur, supra, 12 F. Cas. at p. 564, the court observed:

"Of course, if the voyage was negligently or wantonly delayed for any considerable period * * *, the engagement of the libellants (seaman) would be at an end, whether the voyage was or not."

A substantial extension caused by the fault or willful neglect of the master or the owner would, in other words, constitute a breach of the articles, releasing the crewmen with earned pay should they demand their discharge. In no sense, however, would such a delay result in the renewal of the articles, by implication of law, for another full term.

Moreover, these considerations would appear to apply with full force to the particular shipping articles involved herein, which contemplated and stipulated an eighteen-month period of employment in connection with a described voyage. Norris, The Law of Seamen, § 114.

In the case at bar, also, the record seems devoid of sufficient evidence to show that the delay was in any way caused by the negligence of the master or the owners. The testimony indicates, instead, that at least part of the delay resulted from repairs and other necessary work on the vessel while she was in drydock. This seems precisely the kind of

contingency which seamen must necessarily assume.

Furthermore, as pointed out earlier, libellants concede that prior to the SS LOMALAND'S arrival at the Port of New York none of them (with the single exception of Garcia) had at any time demanded or requested his discharge.

In both these respects the situation is basically analogous to that in Hamilton v. United States, supra, where the Circuit Court noted (268 F. 18):

> "There was no demand for release and payment of wages on the ground that the voyage had been extended by the willful or negligent action of the owner or master, and the proof did not require the conclusion that the extension of the voyage was due to that cause."

Similarly, in the case at bar the record reveals the absence of any demand and in addition fails to establish fault on the part of the master or owners. See, also, Shanley v. United States, supra, 294 F. at p. 505; Uriarte v. United States, supra, 14 F.2d at p. 165.

Even assuming such proof as to fault, however, renewal of the articles by operation of law would not follow in this case. Libellants' rights under the general maritime law in this regard fully protected by reason of the fact that each libellant received additional wages, at the same rate of pay as under the original articles, *for the entire period of the delay.*

The alleged renewal urged by libellants at the trial would presumably also entail renewal of the terms of the articles with respect to the vessel's itinerary, including particular ports mentioned therein. Such a result seems, pragmatically, entirely out of harmony with the realities of maritime commerce.

Moreover, it may be noted that under the fact pattern in this case, no new "cycle" was commenced. In other words, the vessel did not accomplish the entire voyage stated in the itinerary and then set out again, but simply completed her original voyage according to the itinerary set forth in the articles.

■ Libellant Garcia's claim requires no distinctive treatment, despite the fact that he requested his discharge sometime during the vessel's stay at the Port of Vancouver, on the west coast of Canada. He did so in order that he might permanently settle in that country, and his request seems to have been denied primarily because Canadian immigration regulations prohibited such entry. In any event, he too received full additional pay; and the mere fact that he demanded his discharge would not, under the circumstances, entitle him to prevail on the claim of a complete renewal.

II.

That the Port of New York constituted an appropriate "final port of discharge" within the intent and meaning of the shipping articles involved herein can scarcely be doubted. As used in shipping articles, a "final port of discharge" is defined as

> " * * * the last port of delivery where either cargo or ballast is discharged or where some other act is done which has the effect of terminating the voyage there. It is that port at which the vessel is completely relieved of her cargo and becomes ready for another venture." Norris, op. cit., § 115

See, also, Schermacher v. Yates, 57 F. 668, 669 (E.D.N.Y., 1893).

■ Here, the stated itinerary included a call at an east coast port as the concluding part of the voyage; and the evidence indisputably establishes that the vessel was in fact finally relieved of all her cargo at the Port of New York. Therefore, it seems altogether apparent that New York, where the voyage actually ended, constituted an appropriate "final port of discharge" under the circumstances.

■ Nor did the particular immigration classification accorded to libellants upon their signing off the vessel in any way alter the status of New York as a final port of discharge.

Libellants contend in this respect that they should have been placed in the im-

migration category of D–2, rather than that of "voluntary departure," or NE–123, the classification they actually received upon their discharge in New York. 8 U.S.C.A. § 1282; 8 C.R.F. § 252.1(d) (1, 2).

Significantly, the evidence establishes that the United States immigration authorities directed the classification of libellants as "voluntary departures" and that such status was not determined by respondent-shipowner.

 While the statute (8 U.S.C.A. § 1221 et seq.) requires a shipowner to obtain the consent of the immigration authorities before discharging an alien crewman in the United States, that obligation is essentially a duty owed to the United States, rather than to the seaman. Moreover, it is the seaman, rather than the shipowner, who retains prime responsibility for his immigration status. See Grivas v. Alianza Compania Armadora, 150 F.Supp. 708, 714 (S.D.N.Y., 1957), modified, 276 F.2d 822 (2nd Cir., 1960).

Counsel for libellants complains that the voluntary departure certificates issued by the immigration authorities stated that the bearer was "illegally" in the country. Even assuming that libellants actually sustained damage by reason of the "voluntary departure" status accorded them, that damage cannot be attributed to the fault of "Sirena," the shipowner. In point of fact, however, no such damage has been shown.

 It appears that each of the libellants either obtained reemployment aboard another vessel or was repatriated. The rather tenuous allegations that libellants were stigmatized by their "voluntary departure" classification remains unsupported by the evidence. Indeed, the record lacks any proof whatsoever that libellants sustained damage by virtue of the immigration status accorded them.

### III.

Libellants' fourth cause of action alleges, in essence, that the expiration of the period provided in the articles while the voyage was still in progress was tantamount to sailing from an American port without articles. Hence, libellants assert as an alternative claim that the expiration of the stipulated period during the course of the voyage constituted a violation of 46 U.S.C.A. § 564 and thereby subjected respondents to the penalties provided by 46 U.S.C.A. §§ 575, 578 for "shipping without articles."

In pertinent part, the basic substantive statute here involved (46 U.S.C.A. § 564) provides that:

"The master of every vessel bound from a port in the United States to any foreign port other than vessels engaged in trade between the United States and the British North American possessions, * * * shall, before he proceeds on such voyage, make an agreement, in writing or in print, with every seaman whom he carries to sea as one of the crew * * * [regarding] the nature and, as far as practicable, the duration of the intended voyage or engagement, and the port or country at which the voyage is to terminate. * * *"

Whether this statute and the related penalty provisions found in 46 U.S.C.A. §§ 575, 578, would apply, as in the case at bar, to foreign ships and foreign seamen in American ports seems, at best, somewhat doubtful. See The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152 (1885); Evangelinos v. Andreavapor Cia. Nav., S.A., 188 F. Supp. 794 (S.D.N.Y., 1960), aff'd 291 F. 2d 624 (2nd Cir., 1961); Ktistakis v. S.S. Star, 192 F.Supp. 895 (E.D.Va., 1961); The Elswick Tower, 241 F. 706, 709 (S.D.Ga., 1917); The Montapedia, 14 F. 427 (E.D.La., 1882).

In contrast with other sections relating to merchant seamen (e. g. 46 U.S.C.A. §§ 597, 599), the provisions of 46 U.S.C.A. §§ 564, 575, 578, contain no explicit language making them applicable to situations involving foreign vessels and foreign seamen. See The Elswick Tower, supra, 241 F. at pp. 709, 710. Moreover, it may be noted that the parties agreed, by the express terms of the articles, to

apply the law of the flag (Libellants' Exhibit 1, par. 10).

While the fact that American stockholders concededly controlled "Sirena" may perhaps present a countervailing factor militating in favor of applying United States law, the court finds that it need not now decide the general question of whether 46 U.S.C.A. § 564 would apply to such a foreign ship and alien seamen. Thus, even if it be supposed that the provisions of 46 U.S.C.A. §§ 564, 575, 578 would apply to such foreign vessels, a fair reading of the statutes and the judicial construction given them indicates that the circumstances of this case are not within the terms, sense or policy of those provisions. See, e. g. Hamilton v. United States, supra, 268 F. at pp. 17–18; Corrigan v. United States, supra; The Belvedere, 100 F. 498, 499 (N.D., Calif., 1900), aff'd 108 F. 299 (9th Cir., 1901).

Title 46 U.S.C.A. § 564 was never intended to apply to the fact pattern presented by this case, where valid shipping articles were opened and where the period mentioned in such articles subsequently expired a short time before completion of the vessel's voyage.

No case discovered by either counsel or by the court, through its own independent research, has interpreted such a fact situation as falling within the purview of the statute (46 U.S.C.A. § 564). Moreover, as pointed out by this Court in Corrigan v. United States, supra, 298 F. at p. 613, the statute, being penal in nature, must be strictly construed.

By its very terms, 46 U.S.C.A. § 564 provides for penalties for a shipowner who sails from an American port without articles. But even accepting libellants' interpretation of the statute, it is apparent that the vessel sailed from New Orleans with valid articles. Nor can San Pedro, California, in any sense be regarded as a port of embarkation since the undisputed evidence established that it was only entered for the purpose of "bunkering" or obtaining fuel. Moreover, the final leg of the voyage, between Providence and New York, cannot be regarded as itself an independent voyage and, in any event, falls with the exception covering coastwise voyages. See 46 U.S.C.A. § 544. Nelson v. Moore-McCormack Lines, Inc., 201 F.Supp. 40 (S.D.N.Y., 1961), aff'd 297 F.2d 936 (2nd Cir., 1962).

For the reasons stated, the libel must be dismissed and judgment entered in favor of respondents.

This opinion shall constitute the court's findings of facts and conclusions of law. General Admiralty Rule 46½, 28 U.S.C.

Settle decree.

The court wishes to commend counsel on both sides for their thorough preparation and able argument.